**CRAGO**

v.

**KINZIE.**

Court of Common Pleas of Ohio,
Harrison County.

No. 95–H–203.

Decided June 1, 2000.

52

54

WILLIAM F. CHINNOCK, Judge.

This opinion examines and weighs age-old fundamental rules of equity against contemporary scientific principles surrounding genetic testing to disestablish paternity.

## History of the Case

This is a juvenile court action in which a putative father attempts to disestablish himself as the biological father of two children through genetic testing. He makes this attempt almost a decade after identifying himself on birth certificates as the father of the children born to the unmarried woman with whom he was living at the time of their births. This the law does not permit him to do.

This juvenile court action originated as a child support action filed by the mother of two children under R.C. 3103.03 at the behest of the local child support enforcement agency, through which the children were receiving public assistance. On January 23, 1996, this court ordered the putative father to pay child support for the children to the welfare agency in the minimal sum of $50 per month for both children, without a formal determination of parentage being made, under R.C. 2151.231 (Action for Child Support Order). This statute specifically provides that a child support order issued under it does not preclude a subsequent action to establish or disestablish the parent/child relationship, if the parentage issue was not determined in the child support action.

Plaintiff mother and defendant father were living together as husband and wife, although not married, when the children, Jay Thomas Kinzie (DOB 7/23/91) and Meranda Marie Kinzie (DOB 6/24/92) were born. Both children's birth certificates list their surname as "Kinzie"; both children's birth certificates specify "Walter J. Kinzie" as their father; and both children's birth certificates are signed by "Walter J. Kinzie" and "Cynthia L. Crago" as "parent or other informant" under the acknowledgment "I certify that the personal information provided on this certificate is correct to the best of my knowledge and belief."

In June 1999, approximately eight years after the birth of Jay and seven years after the birth of Meranda, the father requested the court to direct the mother and children to undergo genetic testing to determine the nonexistence of a parent/child relationship between him and the children. The mother filed objections to the request. The putative father argues that the paternity of the minor children has never been established and that he is entitled to have genetic testing to establish the existence or non-existence of a parent/child relationship. The putative father correctly states that the child support hearing conducted January 23, 1996 did not result in a finding of paternity, but only in a finding of child support; he also correctly states that the paternity of the minor children has never been established by a court of law. Neither of these issues, however, is

determinative of the case. The determining issue can be stated as follows: Did the putative father take some action or refrain from taking some action that he reasonably should have taken, which gave rise to a conclusion, reasonably relied upon by the children, the mother, or the public, which now precludes him from attempting to establish the contrary of that conclusion?

The putative father argues that his actions at the time of the birth of the children do not fully and finally resolve the issue of paternity, but merely give rise to a presumption of paternity that can be overcome by clear and convincing evidence, which is now available through genetic testing. To reiterate, defendant's actions, which he claims create only a rebuttable presumption regarding his paternity, include (a) granting his surname to the children on their birth certificates, (b) specifying himself to be the "father" of the children on their birth certificates, and (c) signing the children's birth certificates containing this information under the legend "I certify that the personal information provided on this certificate is correct to the best of my knowledge and belief."

## Basis of Decision

In reliance upon statutes, case law, public policy, rules of equity, and the "best interests of the child" standard, this court finds the father's argument to be without merit and holds that his voluntary and unequivocal actions taken at the times of the births of the children constitute binding acknowledgments of paternity. This, in turn, precludes him at this late date from attempting to establish the contrary. An "acknowledgment" is "a clear recognition," "a direct unqualified admission," "a distinct unconditional recognition." 1A Corpus Juris Secundum (1985) 144.

## "Presumptions" and "Birth Certificate" Statutes

Ohio's statute on presumptions as to the father and child relationship, R.C. 3111.03, and the birth certificate statute, R.C. 3705.09(F), which were in effect at the time of the children's births (1991 and 1992), are interrelated and relevant.

The "presumption" law at that time provided that "[a] man is presumed to be the natural father of a child [where he] * * * signs the child's birth certificate as an informant as provided in section 3705.09 of the Revised Code." Former R.C. 3111.03, 142 Ohio Laws, Part III, 5346.

The "birth certificate" law at that time provided that where the mother is not married, "if both the mother and the *father* sign the birth certificate as informants," "[t]he name of the *father* of such child shall * * * be inserted on the birth certificate" and "in such a case the child may be registered by the surname

of the *father* if the mother and *father* so designate." (Emphasis added.) Former R.C. 3705.09(F), 143 Ohio Laws, Part IV, 6036.

As can readily be seen, the presumption statute creates a presumption of paternity where the man signs the birth certificate as an informant. The birth certificate statute goes even further by speaking in terms of the "father" where, as in the case at bar, both the mother and the father sign the birth certificate as informants, and register the child by the surname of the father. The legislature's use of the term "father" demonstrates its intention to provide that where the unmarried mother and a man take these actions, they make a binding acknowledgment that the man is in fact the putative father, also known as the "unwed biological father." *In re Adoption of Greer* (1994), 70 Ohio St.3d 293, 638 N.E.2d 999. Such action constitutes more than "a mere presumption"; it constitutes a binding acknowledgment of paternity. Any contrary interpretation of the language of the statute would be nonsensical.

The putative father argues that the presumption statute, R.C. 3111.03, specifies that presumptions arising under it can be rebutted by clear and convincing evidence, and it is undisputed that genetic testing meets this standard of proof. The presumption statute was first enacted in 1982, and over the past two decades has been amended a half-dozen times, including its July 1, 2000 version. Under the statute's recent versions, signing the birth certificate is no longer specified as creating a presumption of paternity and genetic testing is deemed to give rise to a determination of paternity, which controls over a presumption of paternity. It should not go unnoticed, however, that the terms "determination" and "presumption" relate to establishing paternity and not to disestablishing paternity. Under the 1991 version that was in effect at the time of the births of the children, the act of the man signing the birth certificate creates a presumption of paternity, and genetic testing is not mentioned in the statute. *In Interest of W.M.V.* (N.D.1978), 268 N.W.2d 781 (law in effect at time of child's birth is applicable in paternity actions unless legislature manifests an intention to contrary). Further, both the 1991 and 2000 versions of the statute provide that if two presumptions arise under it, "the court shall determine, based upon logic and policy considerations, which presumption controls"; this language demonstrates the intent of the legislature for the court to use its discretion to balance the equities, taking into consideration not only the rights of the father, but also the rights of the child, the mother, and the public in rendering its decision.

### Best–Interests–of–Child Statute and Case Law

The Ohio Juvenile Code mandates that it "shall be liberally interpreted and construed so as to * * * provide for the care, protection, and mental and physical

development of children." R.C. 2151.01. The "overriding concern" of the Ohio legislature in enacting the child support law, R.C. 3113.215, was to ensure the best interests of the child. "This fact is evident from R.C. 3113.215, where the phrase 'best interest of the child[ren]' is used thirteen times." *Marker v. Grimm* (1992), 65 Ohio St.3d 139, 141, 601 N.E.2d 496, 498. Ohio's version of the Uniform Parentage Act, R.C. 3111.13(C), mandates that any court order issued under it must be in "the best interests of the child." *Broxterman v. Broxterman* (1995), 101 Ohio App.3d 661, 656 N.E.2d 394.

■ For at least a century and a half, the "best interests of the child" standard has been the polestar for Ohio courts in determining matters involving children. *Gishwiler v. Dodez* (1855), 4 Ohio St. 615, paragraph two of the syllabus ("In such a controversy for the custody of a child incapable of electing for itself, the order of the court should be made with a single reference to its best interests").

This legislative and case law mandate is in accord with the "best interests" standard adopted by sister states. In *Michael K.T. v. Tina L.T.* (1989), 182 W.Va. 399, 387 S.E.2d 866, the court established a procedure for equitable *in camera* "best interests" hearings by which the court considers the equities surrounding the particular facts and circumstances of the case and determines whether the admission of genetic test results would be in the best interests of the child. This determination focuses on such factors as (1) the length of time between when the putative father was first placed on notice that he might not be the biological father and when he acted to contest paternity, (2) the length of time during which the putative father assumed the role of father to the child, (3) the facts surrounding the putative father's discovery of the alleged nonpaternity, (4) the nature of the father/child relationship, (5) the age of the child, (6) the harm which may result to the child if paternity were successfully disproved, (7) the extent to which the passage of time may have reduced the chances of establishing paternity and a child support obligation in favor of the child, and (8) all other factors involved in the potential disruption of the parent/child relationship or the chances of undeniable harm to the child.

The court in *Michael K.T.*, 182 W.Va. at 405, 387 S.E.2d at 872, justifiably decreed that in making a "best interests" determination "if there has been more than a relatively brief passage of time * * * the law favors the innocent child over the putative father in certain circumstances."

■ This court conducted an *in camera* "best interests" hearing in the case at bar. The evidence demonstrated that the father and mother lived together from early 1988 to late 1994; that the mother did not have sexual relations with anyone other than the father for the entire period they lived together; that the children were born in 1991 and 1992 and the father always treated them as his own

children and held himself out in the community as their natural father; that when the mother left the father in 1994 because of his abuse, in a moment of anger he shouted to her "the children are probably not mine anyway"; that when the mother asked the father why he would say such a thing, he was unable to provide any factual basis for his angry comment; that the father over the years continually pursued the mother to return to live with him but that she always refused; that in 1995 after the mother again refused to re-couple with the father, he shouted at her, "I never believed that the children were mine anyway," to which she responded, "Ridiculous"; that in 1995 the father stopped supporting the children; that in 1996, when the mother went to the local public assistance agency and obtained minimal sustenance of about $200 per month per child, the local child support enforcement agency had her file the R.C. 2151.231 action against the father for child support, resulting in an award of $50 per month paid by the father to the agency; that in response to the child support action ordering a minimal payment, the father obtained information from the agency regarding genetic testing, but failed to act on it; that the father continued visiting the children until mid–1997 when he stopped visiting them after the mother again told him that she would not return to live with him; that in early 1999, the mother asked the agency to help her obtain an increase in child support from the father, who then was earning a moderate income, which would shift the burden of support from the taxpayers to the father; and that in response, the father made his request for genetic testing, which was the springboard for this action.

The court finds upon this evidence (a) that the children are forced to live on minimal public assistance and income from the mother's part-time job, (b) that in addition to the mother having to care for the children on a full-time basis, she must work part-time because she and the children cannot exist soley on public assistance, (c) that the taxpayers of Ohio are supporting the father's children with their tax dollars, despite the fact he has a moderate-pay job with an automotive agency, (d) that the father's real motive in requesting genetic testing arises from his anger at the mother's refusal to live with him and his consequent hope to escape parental responsibility of child support, not from any legitimate belief that he is not the biological father of the children, (e) that the father's acknowledgements of paternity at the births of the children were relied upon and resulted in inaction regarding paternity by the mother and children; (f) that the father accepted the benefits of his status as the children's father, and deprived them of timely action to hold any other possible natural father liable for child support; (g) that the father has allowed so much time to elapse that the intervening equities of the children, the mother, and the public outweigh those of the father; and (h) that admission of genetic test results in this case fails to meet the "best interests of the child" criteria.

## Supporting Case Law

By implication, Ohio case law supports the decision of this court. The word putative means "supposed, believed, reputed." Garner, A Dictionary of Modern Legal Usage (2 Ed.1995) 721. A "putative father" is the "alleged biological father of a child born out of wedlock." Garner, Black's Law Dictionary (7 Ed.1999) 623. "Putative fathers" are recognized under Ohio law. R.C. 3107.01. The Ohio Supreme Court has held that an unmarried man who identifies himself as the father and signs the birth certificate of a child is deemed to be the child's putative father or "unwed biological father," which legal status gives him the right to withhold his consent to the adoption of the child. *In re Adoption of Greer* (1994), 70 Ohio St.3d 293, 638 N.E.2d 999.

Under *Greer*, an unmarried man who signs a birth certificate identifying himself as the father of a child by his act acquires the status of a putative father or "unwed biological father" and further acquires the right to withhold his consent to the adoption of the child. It would, therefore, be contrary to logic to characterize the action that gives rise to his status as a putative father to be anything other than a binding acknowledgment.

Additional case law supporting this decision is found in cases involving public policy and the rules of equity.

## Public Policy

Turning to the issue of public policy, the increased availability of genetic testing over the past decade has generated debate in the legal community, including the courts and the legislature, as to whether the policy of the law regarding paternity should favor finality (bringing closure to a legal action) or perfection (achieving a perfect result in a legal action). The issue has arisen in annulment, dissolution, divorce, adoption, inheritance, child support, and paternity cases, and a great multitude of factual circumstances exist among the cases. A key consideration in the "finality v. perfection" debate, as it relates to genetic testing cases is whether in a particular case the reputed father alleges that he was induced to take the action creating his putative father status as the result of fraud by the mother. Where fraud is alleged, the courts look closely to determine whether there is any evidence of deceit by the mother upon which the father may have reasonably relied in forming his original belief that he is the biological father. In the case *sub judice* there is no allegation by the father of fraud by the mother; the father's actions on the occasion of both births appear to have been made freely and voluntarily.

In the absence of fraud, the law by necessity favors the value of finality over the value of perfection. The Ohio Supreme Court stated in *Knapp v. Knapp* (1986), 24 Ohio St.3d 141, 144–145, 24 OBR 362, 364, 493 N.E.2d 1353, 1356:

"Finality requires that there be some end to every lawsuit, thus producing certainty in the law and public confidence in the system's ability to resolve disputes. Perfection requires that every case be litigated until a perfect result is achieved. For obvious reasons, courts have typically placed finality above perfection in the hierarchy of values."

Again, in *Strack v. Pelton* (1994), 70 Ohio St.3d 172, 175, 637 N.E.2d 914, 916, the Supreme Court of Ohio reiterated that courts have typically placed the value of finality over the competing value of perfection, especially in cases involving minors: "Finality is particularly compelling in a case involving determinations of parentage, visitation, and support of a minor child."

The Supreme Court of Ohio has consistently followed the public policy favoring finality over perfection in actions involving children.

### Doctrine of Equitable Estoppel

■ The rules of equity by their nature are involved in parentage cases involving genetic testing. Over two centuries ago, Blackstone in his Commentaries on the Law of England (1765), said that an equitable estoppel arises " 'where a man hath done some act, or executed some deed, which estops or precludes him from averring anything to the contrary.' " *Ensel v. Levy & Bros.* (1889), 46 Ohio St. 255, 259, 19 N.E. 597, 599. The doctrine of equitable estoppel has been formulated primarily to prevent results contrary to good conscience and fair dealing, and some courts have applied the doctrine to prevent a man from attempting to disprove paternity after he has held himself out to be the father of a child. Annotation, Admissibility and Weight of Blood–Grouping Tests in Disputed Paternity Cases, 43 A.L.R.4th 579, 610–615; *Brite v. Brite* (1969), 61 Misc.2d 10, 305 N.Y.S.2d 65 (doctrine of equitable estoppel barred admission of blood test results that demonstrated nonpaternity, given father's failure to question paternity during six-year period prior to divorce); *Hall v. Hall* (1969), 215 Pa.Super. 24, 257 A.2d 269 (doctrine of estoppel precluded husband from using blood tests to establish nonpaternity where child was acknowledged as husband's child in separation agreement and paternity was not questioned during more than two years between child's birth and separation of the parties); *Gonzalez v. Andreas* (1976), 245 Pa.Super. 307, 369 A.2d 416 (dispositive issue in determining whether putative father is estopped from denying paternity is whether he has indicated by his conduct that the child is his own).

In *Gonzalez*, the Supreme Court of Pennsylvania points out how the passage of time is significantly and inexorably related to equitable estoppel:

"The representation of parentage inevitably obscures the identity and whereabouts of the natural father, so that the child will be denied the love, affection, and support of the natural father. As time wears on, the fiction of parentage

reduces the likelihood that the child will ever have the opportunity of knowing or receiving the love of his natural father." *Id.,* 245 Pa.Super. at 312, 369 A.2d at 419.

 Equitable estoppel applies where a misrepresentation by one party induces reasonable reliance by another party, who would suffer prejudice if the representing party were not estopped from contradicting this earlier misrepresentation. *First Fed. S. & L. Assn. v. Perry's Landing, Inc.* (1983), 11 Ohio App.3d 135, 145, 11 OBR 215, 226–227, 463 N.E.2d 636, 647–648. The acceptance of benefits from a transaction may give rise to an equitable estoppel to question the validity of the transaction. *Busby v. Finn* (1853), 1 Ohio St. 409; *Hampshire Cty. Trust Co. v. Stevenson* (1926), 114 Ohio St. 1, 150 N.E. 726.

As noted in *Clevenger v. Clevenger* (1961), 189 Cal.App.2d 658, 670–673, 11 Cal.Rptr. 707, 714–715, where the putative father represents himself as the natural father of the child, certain benefits flow to him and certain detriments flow to the child. Benefits to the father include (a) the bestowal upon him of the love and affection of the child, (b) the father's possession and custody of the child, and (c) the public's recognition of him as a father, a status from which he may derive prestige and fulfillment. Detriments to the child based upon the putative father's representation that he is the natural father may include (a) depriving the child of timely action on his behalf by the mother to find and hold the natural father liable for child support, (b) inducing the child to render to the father the affection and love of a son or daughter, only to inflict—through the publication of his or her illegitimacy—deep injury upon the child, and (c) inducing the child to hold himself out to the community as the natural son or daughter of the putative father, which the father obviously desires, only to suffer the abrupt removal of that status and resulting injury to the child. Thus, the doctrine of equitable estoppel can militate against the admission of genetic test results in parentage actions.

## Doctrine of Laches

 The doctrine of laches prevents an action "by a plaintiff who has allowed so much time to elapse that the intervening equities of the defendant outweigh those of the plaintiff." 66 Ohio Jurisprudence 3d (1986) 415, Limitations and Laches, Section 219. Laches is a defense to a paternity action. *Wright v. Oliver* (1988), 35 Ohio St.3d 10, 517 N.E.2d 883; *Ferree v. Sparks* (1991), 77 Ohio App.3d 185, 601 N.E.2d 568; *Seegert v. Zietlow* (1994), 95 Ohio App.3d 451, 642 N.E.2d 697. That "equity aids the vigilant, not those who slumber on their rights," is a principle that "regards the just and important considerations that rights should be asserted before lapse of time may have added to the difficulty and uncertainty in judicial inquiry, and before acquiescence may have encouraged

the adverse party to so change his position * * * that the enforcement of the right would impose unnecessary loss or hardship upon him." *Harris v. Wallace Mfg. Co.* (1911), 84 Ohio St. 104, 108–109, 95 N.E. 559, 560.

To invoke the doctrine of laches, it must be shown that the person for whose benefit the doctrine will operate has been materially prejudiced by an unreasonable and unexplained delay of the person asserting his claim. *Hulett v. Hulett* (1989), 45 Ohio St.3d 288, 544 N.E.2d 257; *Riddle v. Riddle* (1992), 63 Ohio Misc.2d 43, 619 N.E.2d 1201; *Connin v. Bailey* (1984), 15 Ohio St.3d 34, 15 OBR 134, 472 N.E.2d 328; *Smith v. Smith* (1959), 168 Ohio St. 447, 156 N.E.2d 113, 7 O.O.2d 276. Laches arises not from mere delay but from delay that results in such a disadvantage to the adverse party that to entertain the action may accomplish an inequitable result. *Kaifer v. Ohio Leather Co.* (1930), 122 Ohio St. 476, 172 N.E. 280. The "unreasonable delay" component of laches may be so obvious on its face in a particular case, however, that the plaintiff is compelled in his initial pleading to explain how he came to be so long ignorant of his rights and how his delay has not resulted in any change of position by the other party. *Russell v. Fourth Natl. Bank* (1921), 102 Ohio St. 248, 131 N.E. 726. This would be especially applicable to cases to disestablish paternity where the passage of time between the birth and the action is substantial.

Thus, the doctrine of laches also can militate against the admission of genetic test results in parentage actions.

### Doctrine of *Res Judicata*

The doctrine of *res judicata* is the rule of equity most likely to be applicable in a parentage case involving genetic testing. Its underlying rationale is succinctly set forth by the Ohio Supreme Court in *Anderson v. Richards* (1962), 173 Ohio St. 50, 53, 18 O.O.2d 252, 254, 179 N.E.2d 918, 920:

"The reasoning in such cases is that a party should have his day in court, and that that day should conclude the matter. A party is bound then to present his entire cause and he is foreclosed from later attempting to reopen the cause as to issues which were or could have been presented."

In *Stromberg v. Bratenahl Bd. of Edn.* (1980), 64 Ohio St.2d 98, 100, 18 O.O.3d 343, 344, 413 N.E.2d 1184, 1186, the Ohio Supreme Court, citing a multitude of its century-old decisions, proclaimed, "This court has uniformly adhered to the doctrine of *res judicata* to prevent repeated attacks upon a final judgment." *State ex rel. Ohio Water Serv. Co. v. Mahoning Valley Sanitary Dist.* (1959), 169 Ohio St. 31, 8 O.O.2d 1, 157 N.E.2d 116; *Burton, Inc. v. Durkee* (1954), 162 Ohio St. 433, 55 O.O. 247, 123 N.E.2d 432; *Quinn v. Leroy* (1928), 118 Ohio St. 48, 160 N.E. 453; *Pollock v. Cohen* (1877), 32 Ohio St. 514.

The Ohio Supreme Court in *Gilbraith v. Hixson, supra,* 32 Ohio St.3d at 131, 512 N.E.2d at 960–961, explained:

"Simply put, the doctrine serves vital public interests by assuring that all litigation has a reasonable ending point and by preventing a party from having to contest the same issue or cause more than once. * * * '[P]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the results of the contest, and that matters once tried shall be considered forever settled as between the parties.' *Federated Dept. Stores [Inc. v. Moitie* (1981), 452 U.S. 394] at 401 [101 S.Ct. 2424, 2429, 69 L.Ed.2d 103, 110–111] * * *. In achieving precisely these ends, the doctrine effectively promotes stability, certainty, respect, consistency and finality, both in individual judicial determinations and in the legal system as a whole.

"In our estimation, the same considerations underpinning *res judicata* as a doctrine of general significance apply with equal force in parentage actions, and there is, accordingly, no sound policy reason for denying effect to the doctrine in such cases. The establishment and maintenance of the various aspects of the relationship between parent and child is a particularly intricate, sensitive and emotional process with which courts should be reluctant to interfere. In those cases where, by force of events, judicial intervention occurs, where the matter of parentage is determined with finality and in the absence of fraud, and where that determination is not later vacated, either on direct appeal or pursuant to a recognized legal remedy such as that set forth in Civ.R. 60(B), the policy of this state requires, in sum, that the parent-child relationship be shielded from the unsettling effects of further judicial inquiry, and that relitigation of parentage be barred, as a general rule, in any subsequent actions, including those initiated under R.C. Chapter 3111."

In reversing the trial court's decision granting the putative father's motion for Civ.R. 60(B) relief from judgment based upon genetic test results excluding his paternity despite the fact he had previously signed an acknowledgment of paternity, the appellate court in *Shaffer v. Rusnak* (July 1, 1998), Guernsey App. No. 97 CA 26, unreported, 1998 WL 429624, pointed out: "[T]here must be some finality to a judgment. One cannot chose to be a parent and then change his or her mind when they decide to dissolve their relationship with the biological parent."

The doctrine of *res judicata* not only applies where a matter has been adjudicated, but also where the matter "could have been adjudicated." *Covington & Cincinnati Bridge Co. v. Sargent* (1875), 27 Ohio St. 233; *Bolles v. Toledo Trust Co.* (1940), 136 Ohio St. 517, 17 O.O. 156, 27 N.E.2d 145. In *Johnson's Island v. Danbury Twp. Bd. of Twp. Trustees* (1982), 69 Ohio St.2d 241, 245–246,

23 O.O.3d 243, 246, 431 N.E.2d 672, 675, the Ohio Supreme Court reiterated this aspect of the doctrine:

"Decisions of this court, and of other jurisdictions, have established that the doctrine of *res judicata* is applicable to defenses which, although not raised, could have been raised in the prior action. * * * This principle accommodates the finality of judgments."

Although it is arguable in this case that the father could have litigated his parentage in the January 23, 1996 child support hearing under R.C. 2151.231, triggering the application of *res judicata,* because the statute specifically precludes the doctrine as a bar to a subsequent paternity action, this court finds that the doctrine is not applicable.

### Rules of Equity and "Best Interests" Criteria

Most parentage cases, including the instant case, do not fit neatly into a single, predetermined category, nor are they determinable by application of a single rule of law such as equitable estoppel, laches, waiver, acknowledgment, *res judicata,* or other rule of equity, or by the "best interests" doctrine.

The court nonetheless specifically finds in the case *sub judice* that the rules of equitable estoppel and laches, as well as the "best interests" mandate, preclude the father from questioning his parentage through genetic testing. For their entire lives, Jay and Meranda Kinzie have been led to believe by Walter J. Kinzie's actions that he is their father; he cannot at this late date decide otherwise and successfully proclaim to them and the world that his acknowledgment of parentage was merely a cruel hoax.

### Genetic Testing and Rules of Equity

With the advent and widespread availability of genetic testing, it is tempting for putative fathers to assume that their exclusion as the biological father of a child through such testing will necessarily extinguish their duty of parental support. Putative fathers who make this erroneous assumption may learn that the above-mentioned rules of equity (laches, equitable estoppel, *res judicata,* and the best-interests-of-the-child doctrine) render their disestablishment efforts for naught.

These equitable rules justifiably weigh the rights and equities not only of the father, but also those of the child, the mother, and the public. Despite the classification of genetic testing results under R.C. 3111.09(D) as "conclusive," these equitable rules may operate, as they do in the case at bar, to exclude the obtaining and admission of genetic test results which, by their conclusive classifi-

cation under the statute, considers only the rights of the father to the exclusion of the rights of the child, the mother, and the public.

As Justice Herbert Brown stated in his concurring opinion in *Hulett v. Hulett,* 45 Ohio St.3d at 295, 544 N.E.2d at 263:

"A father-child relationship encompasses more (and greater) considerations than a determination of whose genes the child carries. Sociology and psychological components should be considered. The laws governing adoptions have acknowledged that parentage is comprised of a totality of factors, the least significant of which is genetics."

To attain justice, the law must be a flexible tool, capable of being adapted to "the shape of the wood or stone" being worked upon: "Legal rules, which are general, require constant modification and adoption to circumstances, and this is equity. [S]ince law is general, equity must always be on the watch to see that justice is done in the individual case." Cairns, Legal Philosophy from Plato to Hegel (1980) 108.

### Rights of the Child, the Parents, and the Public

As noted by the Supreme Court of Washington, the law recognizes the interests of the child, the parents, and the state in a paternity action, and "[w]here these rights come into conflict, the rights of the child should prevail," and "[t]he best interests of the child standard does not entitle a court to presume that paternity determination is *automatically* in the child's best interest." (Emphasis *sic.*) *McDaniels v. Carlson* (1987), 108 Wash. 2d 299, 310–311, 738 P.2d 254, 261. It cannot be gainsaid that the public has a strong fiscal interest in seeing to it that children are supported by their parents and not by the public. *Johnson v. Adams* (1985), 18 Ohio St.3d 48, 18 OBR 83, 479 N.E.2d 866.

The adverse ramifications of the law taking a "conclusive determination" approach to paternity, without considering the rights of the child, the mother; and the public, now that genetic testing is universally accepted, is made plain in *Clevenger v. Clevenger,* 189 Cal.App.2d at 674, 11 Cal.Rptr. at 716:

"The relationship of father and child is too sacred to be thrown off like an old cloak, used and unwanted. We are dealing with the care and education of a child during his minority and with the obligation of the party who has assumed as a father to discharge it. The law is not so insensitive as to countenance the breach of an obligation in so vital and deep a relation, undertaken, partially fulfilled, and suddenly sundered."

### Reasonable Statute of Limitations to Disestablish Paternity

The mother argues that the putative father's motion is based soley upon his anger resulting from her rejection of him and upon his hope to escape his

parental duty of support; she also argues that from any objective standpoint, the motion is based upon mere suspicion and bare allegations regarding nonpaternity without any factual foundation. She persuasively argues that although reasonable persons would agree that a putative father has the right to question his paternity within a reasonable time period, where a substantial amount of time has passed since the birth of the child without the father taking action to contest parentage, at some point it becomes unreasonable and contrary to public policy for the law to allow him to burden the child, the mother, the public, and the court with a belated attempt to contest paternity.

In 1982, when the Ohio legislature enacted its version of the Uniform Parentage Act in substantially the original form of the Uniform Act, it unfortunately failed to include several fair and equitable provisions of the original Act that would preclude baseless actions and dissipate the rapidly approaching tsunami of parentage actions being filed in our courts as the result of recent amendments to R.C. 3111.03 and 3111.09(D), that to a good extent make the disestablishment of paternity by genetic testing conclusive. The provisions of the Uniform Act that the Ohio legislature neglected to enact are:

"§ 6(a) A child, his natural mother, or *a man presumed to be his father* * * * may bring an action * * * for the purpose of declaring the *non-existence* of the father and child relationship * * * only if the action is brought within a *reasonable time* after obtaining knowledge of relevant facts, but *in no event later than [five] years after the child's birth."* (Emphasis added.)

"§ 7 An action to determine the *existence* of the father and child relationship as to a child who has no presumed father * * * may not be brought later than [three] years after the birth of the child. * * * However, an action brought by or on behalf of a child whose paternity has not been determined is *not barred until [three] years after the child reaches the age of majority."* (Emphasis added.)

The Uniform Act judiciously recognizes the practical incapacity of the child during minority to take action to *establish* paternity, and thus provides a three-years-beyond-majority statute of limitations period for such an action. The Uniform Act further recognizes that in the case of a putative father attempting to *disestablish* paternity, on the other hand, a maximum five-year statute of limitations period is reasonable, because it equitably weighs the rights of the child, the parents, and the public. This significant distinction between the circumstances of the child and those of the parent was apparently overlooked when R.C. 3111.05 was enacted in its present form, providing that "[a]n action to determine the *existence or non-existence* of the father and child relationship may not be brought later than five years after the child reaches the age of eighteen." (Emphasis added.)

*As can be seen, Ohio's existing statute of limitations mistakenly intermingles and confuses the rights of the father regarding disestablishment of paternity with the rights of the child regarding establishment of paternity, to the detriment of the children and people of Ohio.*

As noted above, reasonable persons would agree that a putative father who has reason to believe that he may not be the biological father of a child certainly has the right to question his paternity within a reasonable time period. Where a reasonable time period has passed, however, based upon the circumstances, and in any event not beyond the child's age five, it becomes inequitable to subject the child, the mother, the public, and our judicial system to the inequities inherent in such a delayed inquiry. On its face and as applied, it is inequitable and against public policy for a child who is a citizen of Ohio to be subjected to becoming *filius nullius,* or "no one's son," for a period exceeding two decades, as the law presently burdens the children of Ohio. It would be judicious for our legislature to place the obligation to take action regarding the disestablishment of paternity on the putative father where it belongs, during a time period of reasonable duration, or deem that he has waived his right to do so.

An unintended but likely by-product of a rule making genetic test results conclusive to disestablish paternity, if such rule is not complemented by a reasonable statute of limitations as found in the Uniform Parentage Act, may well be that such testing will be demanded by fathers at the time of divorce simply to secure a strategic advantage, regardless of the existence of any legitimate concern regarding paternity. If the father does not initiate the inquiry, concerns of possible legal malpractice will likely prompt legal counsel to do so. The children of Ohio will suffer beyond imagination; the resulting estrangement of children from their fathers will further erode the fabric of our society; and the future of Ohio will be severely compromised. If, on the other hand, the rule making genetic test results conclusive to disestablish paternity is complemented by a reasonable statute of limitations as found in the Uniform Parentage Act, this legislative action would almost certainly preclude many fathers from making such a demand, whereas they may. otherwise unjustifiably do so simply to secure a strategic advantage in divorce proceedings. Such rule will eliminate the above-noted adverse consequences to our children and society.

I will note for the record another unintended but likely effect of a rule making genetic test results conclusive to disestablish paternity: if such rule is not complemented by a reasonable statute of limitations as found in the Uniform Parentage Act, the taxpayers of Ohio will be required to support children who rightly should be supported by their putative fathers. If the rule making genetic test results conclusive to disestablish paternity, however, is complemented by a reasonable statute of limitations as found in the Uniform Parentage Act, the

taxpayers of Ohio will be prevented from having to support children who rightly should be provided for by those fathers. This case demonstrates the likelihood of such a scenario, with children attempting to live on minimum public assistance and their fathers reimbursing only a fraction thereof to the public agency, with the taxpayers effectively subsidizing these fathers for the balance. Multiplying this situation by thousands of cases, it becomes evident that the tax dollars of many taxpayers are subsidizing many fathers who fail to support their children. This creates an outrageous burden not only on the children who as a result live in poverty, but also on the taxpayers, contrary to public policy.

The Ohio Supreme Court's yet unheeded plea to the Ohio legislature over a decade ago in *Hulett v. Hulett,* 45 Ohio St.3d at 296–297, 544 N.E.2d at 264 (H. Brown, concurring), to preclude the necessity for "judicial law-making" by the enactment of a reasonable, five-year statute of limitations for disestablishing paternity, echoed by Note, Uniform Parentage Act (1991), 16 U. Dayton L.Rev. 497, 520, is even more urgent today than when originally proposed:

"The Uniform Parentage Act ('UPA') and a majority of states which have adopted the UPA place a time limit upon when persons (other than the child) may bring an action to determine the existence or nonexistence of the father and child relationship when there is a presumed father by reason of his marriage to the mother. The UPA allows such an action to be brought within ' * * * a reasonable time after obtaining knowledge of relevant facts, but in no event later than [five] years after the child's birth.' Uniform Parentage Act (1973), Section 6(a)(2). A majority of the seventeen states which have adopted the UPA include a time limit which restricts when such actions can be brought to a period ending shortly after birth.

"*The advantage of these statutory provisions is that they (in varying degrees) force parentage determinations to be made before a long-term relationship is established between the presumed father and the child.* The majority opinion leaves open the possibility of some judicial limitation (on the time for bringing a parentage action) under the doctrine of laches. I support that concept. However, *this is an area where legislation is preferable to judicial law-making. Specific and clear guidelines are needed.*" (Emphasis added and footnote omitted.)

It is manifest that Ohio's adoption of the Uniform Parentage Act's statute of limitations for disestablishment of paternity is in the best interests of the children, the taxpayers, and the people of Ohio, as well as being sound public policy.

### Finding

It is the finding of this court that the actions of Walter J. Kinzie in certifying on the birth certificates of Jay Kinzie and Meranda Kinzie that he is their father

and in bestowing his surname upon them on their birth certificates, constitute binding acknowledgments of paternity. These actions preclude him under the doctrine of equitable estoppel and laches, as well as under the best-interests-of-the-child doctrine, from obtaining or admitting into evidence genetic test results in an attempt to disestablish himself as the father of the children or to escape his responsibility of child support.

For these reasons, the mother's objection to the father's motion for genetic testing of herself and the children is sustained.

*So ordered.*

WILLIAM F. CHINNOCK, J., retired, of the Cuyahoga County Common Pleas Court, Juvenile Division, sitting by assignment.