B.E.B., Appellant,

v.

R.L.B., Appellee.

No. S–7586.

Supreme Court of Alaska.

May 14, 1999.

Alan J. Hooper, Law Office of Alan J. Hooper, Fairbanks, for Appellant.

Rita T. Allee, Fairbanks, for Appellee.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

*OPINION*

BRYNER, Justice.

This case requires us to chart the boundaries of the paternity by estoppel doctrine. B.E.B. was not the biological father of his wife R.L.B.'s newborn son, K., but for several years treated K. as his own son. When B.E.B. and R.L.B. eventually divorced, the superior court ordered B.E.B. to make ongoing child support payments, finding that, in order to prevent K. from suffering emotional harm, B.E.B. should be estopped from denying paternity. We reverse, adopting the majority view of paternity by estoppel. Under this view, we apply the doctrine to prevent financial, not emotional, harm.

I. *FACTS AND PROCEEDINGS*

B.E.B. and R.L.B. were married in 1979. They had one child in 1977 and one in 1979. In 1981 B.E.B. had a vasectomy. Eight years later, in 1989, R.L.B. gave birth to a third child, K. Over the next three years, B.E.B. treated K. as his own son, intended K. to think of him as his father, and represented to the world that K. was his child. B.E.B. was the only adult male role model in K.'s life. K. even called B.E.B. "daddy."

B.E.B. and R.L.B. separated in November 1993. While B.E.B. maintained regular contact with his two older children, he distanced himself from K., denying that K. was his son. K. nevertheless continued to think of B.E.B. as his father.

Fourteen months after separating from B.E.B., R.L.B. filed for divorce, requesting child support for her three children. In response, B.E.B. denied paternity of K. Trial was scheduled for the first week of October 1995. Prior to trial, B.E.B. moved for an order requiring DNA testing to determine whether he was K.'s father; this motion was unopposed. The court granted B.E.B.'s motion in August 1995. Problems arose in obtaining the blood tests, however, and the results of the tests were not available as the date for the divorce trial approached.

B.E.B. moved for a continuance, but the court·denied the motion. The court stated that it would bifurcate the trial, trying all issues unrelated to paternity first and reserving paternity-related issues until the DNA test results were completed.

Trial began on October 10, 1995, with B.E.B. appearing pro se. At the outset, the court confirmed that the trial would be bifurcated. Despite the bifurcation order, the court allowed R.L.B. to testify during the first day of trial about some aspects of her paternity by estoppel claim, including the nature of K. and B.E.B.'s relationship. B.E.B. did not object to this testimony. Nevertheless, on several occasions after this testimony, the court reminded the parties of its bifurcation order. For example, when B.E.B. attempted to cross-examine R.L.B. about adultery, the court interrupted, emphasizing that "we are not litigating paternity in this case." Soon after, the court repeated that "[w]e are not going to decide paternity of K. in ... this hearing because you've asked it to be delayed, and if the evidence is as you say, the Court will consider their defense and decide what happens. But that's not this case." At the end of the first day of trial, the court mused: "So this one-day case has become a two-day case. And without consideration of paternity."

But as trial resumed the following morning, the trial court announced that it would allow the parties to present evidence on the issue of estoppel:

> I don't want any of the parties to be misled by a statement I made yesterday about what issues are being tried here. I have permitted, and there has been no objection to the testimony introduced that is intended to support the estoppel defense to disestablishment of paternity.

The court went on to say that, "pending the results of testing," it would not consider the issue of K. being "the biological child" and would leave the record open for admission of the DNA test results. The court concluded this announcement by saying, "you people can talk about relationships, bonds and things like that." Both parties agreed to this arrangement without further question or comment.

The trial ended on the second day, and the court directed B.E.B. to pay interim support for all of the children in R.L.B.'s custody, including K. Shortly thereafter, the DNA tests were completed. The tests conclusively established that B.E.B. was not K.'s biological father. On.October 20 B.E.B. submitted the test results to the court and asked it to reconsider the interim child support order as to K. He later filed a post-trial motion in which he noted that his vasectomy predated K.'s birth. B.E.B. alleged that R.L.B. had fraudulently led him to believe that K. was his child. He offered to produce evidence of R.L.B.'s fraudulent conduct in response to R.L.B.'s claim of paternity by estoppel.

Despite B.E.B.'s allegations, the court denied further hearing. Relying on this court's decision in *Wright v. Black*,[1] the court observed that paternity by estoppel is "intended to avoid unfairness and emotional harm to the child from frustrating the child's expectation of care and support to adulthood...." The court found that B.E.B. and K.'s relationship was established during K.'s first five years. Noting that these years were arguably K.'s most formative, the court held that B.E.B. was estopped from denying paternity. The court also rejected B.E.B.'s request for a hearing on his claim of fraud, ruling that he should have submitted his evidence earlier: "Trial was the time to assert that he had had a vasectomy. Trial was the time to assert that [R.L.B.] had lied and used fraudulent means to cause him to believe [K.] was his child. Trial was the time to assert that the factors of equitable estoppel should not apply to him."

B.E.B. appeals, arguing that the court wrongfully deprived him of an opportunity to present his evidence of fraud, and that the court misapplied the doctrine of paternity by estoppel.

## II. THE DOCTRINE OF PATERNITY BY ESTOPPEL

### A. The Trial Court Found Paternity by Estoppel Based on Evidence of Potential Emotional Harm to K.

▉ The trial court found that K. would suffer emotional damage if B.E.B. were al-

---

1. 856 P.2d 477 (Alaska 1993).

lowed to abandon the paternal role that he had voluntarily established with the boy. To protect K. from this emotional harm, the court estopped B.E.B. from denying paternity and ordered him to continue paying for K.'s support. B.E.B. maintains that the court applied the doctrine of paternity by estoppel too broadly.[2]

### B. *Alaska's Prior Cases on Paternity by Estoppel Support a Broad "Emotional Harm" Standard of Prejudice.*

Given this court's prior decisions on paternity by estoppel, the trial court's view of the doctrine is understandable. We first acknowledged the doctrine of paternity by estoppel more than a decade ago in *H.P.A. v. S.C.A.*[3] There we observed that "[u]nder normal circumstances it is the biological parents who shoulder the legal responsibility for the welfare of their offspring."[4] But we also recognized that "[t]here are situations ... where a person's conduct towards an infant can give rise to a constructive parental relationship such that one can be adjudged a *legal* parent even if not biologically the same."[5]

We traced paternity by estoppel to the well-established rule of equitable estoppel, which is traditionally invoked upon proof of three elements: conduct or words amounting to a representation, reasonable reliance, and resulting prejudice.[6] Citing the California Court of Appeal's 1961 ruling in *Clevenger v. Clevenger*,[7] we indicated that, in the paternity context, the first two elements of estoppel—representation and reliance—would be met when: (1) the husband directly or implic-

itly represented to the child that he is the father; (2) the husband intended the child to rely on this representation; (3) the child did rely on it and treated the husband as a father; and (4) the child remained ignorant of the true facts.[8] But we had no occasion in *H.P.A.* to consider the third element of estoppel—prejudice. Without mentioning this element, we remanded the case to the trial court, because its findings on estoppel failed to address H.P.A.'s allegation that his wife had misled him as to the existence of paternity.[9]

We addressed the third element of paternity by estoppel when we next considered the doctrine eight years later in *Wright v. Black*.[10] In *Wright*, we stated that "the application of equitable estoppel to paternity cases advances sound policies in the law[.]"[11] We cited *Clevenger* for the proposition that, in a case involving paternity by estoppel, the traditional requirement of prejudice can be met in one of three ways:

(1) the child is deprived of the mother's potential action to hold the natural father responsible for the support of the child; (2) the child gives his love and affection to the husband, expecting care and support until adulthood. Denying paternity later inflicts an emotional injury on the child; (3) the child, who has held himself out as legitimate, suffers a social injury when that status is removed.[12]

We went on to apply *Clevenger*'s formulation of the prejudice requirement, affirming the trial court's decision, which barred Michael Wright from denying his paternal duty

---

**2.** Whether circumstances justifying estoppel exist is generally a question of fact that we review for clear error. *See Wright*, 856 P.2d at 479. But "[w]hether the superior court has the power to apply the doctrine of equitable estoppel to cases where a father denies paternity is ... a question of law[,]" which we review independently. *Id.*

**3.** 704 P.2d 205 (Alaska 1985).

**4.** *Id.* at 208.

**5.** *Id.*

**6.** *See id.* (quoting *Jamison v. Consolidated Utils.*, 576 P.2d 97, 102 (Alaska 1978)).

**7.** 189 Cal.App.2d 658, 11 Cal.Rptr. 707 (1961).

**8.** *See H.P.A.*, 704 P.2d at 208 (citing *Clevenger*, 11 Cal.Rptr. at 714); *see also K.E. v. J.W.*, 899 P.2d 133, 134–35 (Alaska 1995) (interpreting these four criteria as covering the representation and reliance elements of equitable estoppel in the paternity context).

**9.** *H.P.A.*, 704 P.2d at 208–09.

**10.** 856 P.2d 477 (Alaska 1993).

**11.** *Id.* at 481.

**12.** *Id.* at 481 (citing *Clevenger*, 11 Cal.Rptr. at 714–15); *see also K.E.*, 899 P.2d at 135.

to support his former wife Robyn's five-year-old son, Damon.[13] Because Damon had come to rely on Michael as his father, and because this reliance would have made it difficult for Damon to sever his bonds to Michael without suffering emotional harm, we held that the *Clevenger* standards had been met.[14]

Our third and most recent decision on paternity by estoppel is *K.E. v. J.W.*[15] There, in a divorce proceeding, the wife, K.E., requested the trial court to hold her husband, J.W., responsible for post-divorce support of L.E. L.E. was born to K.E. during the marriage, but was not biologically J.W.'s daughter.[16] The trial court declined to estop J.W. from denying paternity and refused K.E.'s request for child support, even though J.W. had treated L.E. as his daughter for two years before he separated from K.E.[17] We affirmed the trial court's decision.[18] While we acknowledged the *Clevenger* standard as being applicable,[19] we concluded that the court was not clearly erroneous in finding that the *Clevenger* prejudice standard had not been met under the specific facts presented—particularly because J.W. had worked away from home and had actually spent only 90 to 180 days with L.E. during the two years before the parties separated.[20]

### C. *The Alternative View of Paternity by Estoppel Favors a Narrower Test of Prejudice Focusing on Financial, Rather Than Emotional, Harm.*

■ R.L.B. urges us to follow the lead of our prior cases by applying the *Clevenger* test here. She argues that the record supports the trial court's finding that K.'s

strong, voluntarily fostered ties to B.E.B. cannot be severed without considerable emotional trauma. In contrast, B.E.B. cites a substantial body of cases in which courts have expressly declined to apply *Clevenger*'s broad test of emotional harm. These courts assert that the doctrine of paternity by estoppel should ordinarily be invoked only upon a showing of economic, rather than emotional, prejudice.

In *K.B. v. D.B.*,[21] the Massachusetts Appeals Court reviewed the conflicting cases on paternity by estoppel and identified two competing policies that these cases promote.[22] *K.B.* described *Clevenger*, on the one hand, as the leading proponent of a policy that focuses on preserving paternal ties after the break-up of a marriage.[23] This policy, recognizing that the bonds between a parent and a young child can seldom be severed without serious emotional harm to the child, strongly discourages non-biological fathers from abandoning parental relationships that they have willingly fostered:

> The reversal of [the non-biological parent's original representation of parenthood], through the publication of the illegitimacy of the child, inflicts deep injury upon [the child]. To be designated as an illegitimate child in preadolescence is an emotional trauma of lasting consequence. Having placed the cloak of legitimacy upon the child, having induced the child to rely upon its protection, the [adult] by abruptly removing it surely harms the child.[24]

Several jurisdictions have followed *Clevenger* in holding that prejudice in such cases can be based on proof of potential emotional harm.[25]

---

13. See *Wright*, 856 P.2d at 481.

14. See *id.*

15. 899 P.2d 133 (Alaska 1995).

16. See *id.*

17. See *id.* at 134.

18. See *id.* at 135.

19. See *id.* at 134–35.

20. See *id.* at 135.

21. 37 Mass.App.Ct. 265, 639 N.E.2d 725 (1994).

22. *Id.* at 728–30; *see also Quintela v. Quintela*, 4 Neb.App. 396, 544 N.W.2d 111, 117–20 (1996) (discussing paternity by estoppel cases).

23. See *K.B.*, 639 N.E.2d at 728.

24. 11 Cal.Rptr. at 714–15.

25. See, e.g., *Pietros v. Pietros*, 638 A.2d 545, 547 (R.I.1994). *See generally K.B.*, 639 N.E.2d at 728–30, and *Quintela*, 544 N.W.2d at 118–19 (both citing numerous cases). *Cf.* Natalie A. Minton, *Equitable Estoppel Precludes Husband in Divorce Proceeding From Refuting Paternity to Avoid Child–Support Payments—Pietros v. Pietros, 638 A.2d 545 (R.I.1994)*, 29 Suffolk U.L.Rev. 625, 630 (1995).

On the other hand, the *K.B.* court described *Knill v. Knill* [26] as a leading case favoring a policy that focuses on establishing paternal ties while a marriage is still healthy.[27] This policy strongly encourages a putative parent to assume the role of an actual parent without fear of later repercussions.[28] In *Knill,* the Maryland Court of Appeals disagreed with the idea that the need to spare a child from the emotional harm caused when a non-biological parent withdraws support justifies the doctrine of paternity by estoppel.[29] The court explained its preference for a policy that strives to foster harmony while the family remains intact:

> In this case, Charles knew that Stephen was not his son and, nevertheless, treated him as his son and as a member of the Knill family. Such conduct is consistent with this State's public policy of strengthening the family, the basic unit of civilized society. We encourage spouses to undertake, where feasible, the support, guidance, and rearing of their spouses' children.... [30]

The court in *Knill* thus concluded that Charles "should not be penalized for his conduct under the circumstances." [31] It opted for a rule limiting estoppel to cases of "financial detriment" [32]—that is, cases in which the non-biological parent's conduct "actively interferes with the children's support from their natural parent." [33]

In favoring the narrow test of financial prejudice over *Clevenger*'s broader emotional harm standard, the *Knill* court relied on the New Jersey Supreme Court's decision in *Miller v. Miller.*[34] The *Miller* court reasoned that "the development of 'emotional bonding' ... is not sufficient to invoke the doctrine of equitable estoppel[,]" [35] because

> to hold otherwise would create enormous policy difficulties. A stepparent who tried to create a warm family atmosphere with his or her stepchildren would be penalized by being forced to pay support for them in the event of a divorce. At the same time, a stepparent who refused to have anything to do with his or her stepchildren beyond supporting them would be rewarded by not having to pay support in the event of a divorce.[36]

Many states now follow the narrow approach to paternity by estoppel described in *Knill* and *Miller,* requiring prejudicial reliance to be proved by evidence of financial harm.[37]

D. *Despite Our Prior Decisions, We Conclude that the Narrower "Financial Harm" Test of Prejudice Must Apply in Paternity by Estoppel Cases.*

Although *H.P.A., K.E.,* and *Wright* undeniably suggest that *Clevenger*'s broader emotional harm test applies in Alaska, the test is not as firmly embedded in our law as it may at first appear. We have never carefully examined the *Clevenger* test of emotional prejudice. As pointed out above, in *H.P.A.* we mentioned *Clevenger*'s discussion of the first two elements of estoppel—representation and reliance—but not its formulation of the third element—prejudice.[38] In *K.E.* we simply concluded that *Clevenger*'s test of

26. 306 Md. 527, 510 A.2d 546 (1986).

27. *See K.B.,* 639 N.E.2d at 728.

28. *See id.*

29. *See Knill,* 510 A.2d at 551–52.

30. *Id.*

31. *Id.*

32. *Id.* at 551.

33. *Id.* at 550 (quoting *Miller v. Miller,* 97 N.J. 154, 478 A.2d 351, 359 (1984)).

34. 97 N.J. 154, 478 A.2d 351 (1984).

35. *Id.* at 358.

36. *Id.*

37. *See, e.g., K.A.T. v. C.A.B.,* 645 A.2d 570, 573 (D.C.1994); *Wiese v. Wiese,* 699 P.2d 700, 702 (Utah 1985). *See generally Quintela v. Quintela,* 4 Neb.App. 396, 544 N.W.2d 111, 117–19 (1996); *K.B. v. D.B.,* 37 Mass.App.Ct. 265, 639 N.E.2d 725, 728–29 (1994); *Knill,* 510 A.2d at 548–50 (citing cases in which courts adopt increasingly popular, narrow requirement of financial detriment).

38. *See H.P.A. v. S.C.A.,* 704 P.2d 205, 208–09 (Alaska 1985).

prejudice had not been met.[39] Only in *Wright* did we expressly apply *Clevenger*'s emotional harm standard.[40] But in so doing, we did not consider the alternative, narrower view of paternity by estoppel.[41] In fact, the parties in *Wright* do not seem to have alerted us to the large body of cases that are at odds with *Clevenger*, since the applicable estoppel standard was evidently uncontested. We thus appear to have accepted *Clevenger* as a conventional description of a uniformly accepted doctrine.[42]

Having now considered the issue in light of the divergent case law, we are persuaded to follow the alternative view of paternity by estoppel. Our preference arises from legal and practical considerations. The duty of support has traditionally been rooted in the biological ties between a parent and a child.[43] This well-accepted principle weighs heavily in favor of a rule that makes estoppel the exception, not the norm. Yet under *Clevenger*'s broad emotional harm standard, the exception would dominate: "To rule ... that the exception applies whenever a child has reached an age when he or she could have a meaningful appreciation of paternity would make the exception the rule and the 'rule' applicable only to one and two year olds." [44]

Moreover, *Clevenger*'s broad rule, centering as it does on a child's emotional well-being after the break-up of a marriage, tacitly assumes that requiring a non-biological parent to pay post-divorce support will encourage a lasting emotional bond. This assumption is highly questionable.

It is far from obvious that precluding a non-biological father from challenging pater-

nity can effectively protect his child's emotional well-being. An order requiring the father to pay support or barring him from challenging paternity will hardly prevent him from publicly claiming that he is not actually the child's father. Of course, it is arguable that if the father knows that he will not be able to shirk his support obligation by challenging paternity, he might be deterred from attempting the challenge. But any such deterrence would be more than offset by the risk that a court order requiring the non-biological father to pay support might itself destroy an otherwise healthy paternal bond by driving a destructive wedge of bitterness and resentment between the father and his child. In short, the *Clevenger* rule is not grounded in reality. To encourage ongoing bonds between a non-biological father and son is certainly desirable; but, as a practical matter, *Clevenger*'s emotional harm standard is not likely to accomplish this commendable goal.[45]

In contrast, the narrower rule, described in cases like *Knill* and *Miller*, strives to attain a more realistic goal. It recognizes "the desirability of encouraging [non-biological parents] to assume voluntarily support of children without the fear that doing so may obligate them permanently." [46] This goal is no less significant or desirable than *Clevenger*'s policy of protecting children's emotional well-being. At the same time, the financial prejudice requirement substantially furthers the stated goal of encouraging voluntary relationships. Thus, unlike *Clevenger*'s interpretation of paternity by estoppel, this alternative interpretation of the

**39.** *See K.E. v. J.W.*, 899 P.2d 133, 135 (Alaska 1995).

**40.** *See Wright v. Black*, 856 P.2d 477, 481 (Alaska 1993).

**41.** *See id.* at 480–81.

**42.** *See id.*

**43.** *See H.P.A.*, 704 P.2d at 207 ("Under normal circumstances it is the biological parents who shoulder the legal responsibility for the welfare of their off-spring.").

**44.** *K.B. v. D.B.*, 37 Mass.App.Ct. 265, 639 N.E.2d 725, 731 (1994). Indeed, it appears that California law effectively precludes non-biological fa-

thers from challenging paternity more than two years after a child is born. *See, e.g., In re Marriage of Freeman*, 45 Cal.App.4th 1437, 53 Cal. Rptr.2d 439, 444–45 (1996) (citing Cal. Fam. Code § 7541).

**45.** *Clevenger* additionally focused on the social injury that results when a child previously thought to be legitimate is recognized as having been born out of wedlock. Our reasons for rejecting the policy of preventing emotional harm as a basis for following *Clevenger* also lead us to reject *Clevenger*'s "social injury" rationale.

**46.** *K.B.*, 639 N.E.2d at 729.

doctrine seems well suited to accomplish its goal.

We therefore hold that the risk of emotional harm inherent in severing a child's relationship with a psychological parent cannot itself suffice as a basis for invoking the doctrine of paternity by estoppel; to support a finding of estoppel, the evidence must show financial prejudice.[47]

## III. CONCLUSION

Because we conclude that the trial court relied on an incorrect legal standard, we REVERSE the order and REMAND this case for a further hearing on this issue. On remand, the superior court may find estoppel only upon a showing that K.'s reliance on B.E.B.'s parental conduct resulted in financial prejudice.

---

**47.** To the extent that *Wright,* 856 P.2d 477, may be read as adopting the emotional harm standard of prejudice, we overrule that decision.