**Timothy W. HUBBARD, Appellant,**

v.

**Amy L. HUBBARD, Appellee.**

No. S–9562.

Supreme Court of Alaska.

March 29, 2002.

---

William T. Ford, Anchorage, for Appellant.

Amy L. Hubbard, pro se, Eagle River, Alaska.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

### OPINION

MATTHEWS, Justice.

## I. INTRODUCTION

Timothy Hubbard was held to be equitably estopped from disestablishing paternity of his stepson, Joshua. On appeal he challenges the sufficiency of the evidence concerning the financial harm requirement of such a determination. We conclude that the evidence was sufficient to support a finding of financial harm.

## II. FACTS AND PROCEEDINGS

Amy Hoover (subsequently, Hubbard) gave birth to a son, Joshua, in October 1991. Joshua's biological father was David Walters, a resident of Ohio. Alaska's Child Support Enforcement Division (CSED) brought a child support action against Walters after Joshua was born. Walters acknowledged paternity of Joshua, and agreed in writing to pay child support of $500 per month.

Amy married Timothy Hubbard in April 1994. By mutual agreement with Timothy, Amy asked CSED to terminate the child support case against Walters. Timothy and Amy also had Walters sign a form relinquishing his parental rights and consenting to Joshua's adoption by Timothy.[1] But Joshua was never adopted by Timothy, and Walters's parental rights were never terminated by a court. Timothy did, however, legitimate Joshua by having his name placed on Joshua's birth certificate.[2] During Timothy and

---

1. In the relinquishment of parental rights that Walters signed, he agreed that "the minor child shall hereafter be a stranger to me for all purposes...."

2. This occurred when the parties were living in North Carolina. Joshua was born in Ohio. Timothy's counsel represents that under Ohio law this creates a rebuttable presumption of paternity and that since Timothy is not Joshua's natural father, this presumption has been rebutted. We

Amy's marriage, Joshua viewed Timothy as his father.

Timothy and Amy separated in October 1997. As part of the divorce proceedings, Timothy sought to have his paternity of Joshua disestablished. Superior Court Judge John Reese found Timothy to be equitably estopped from disestablishing paternity, finding both emotional and financial harm. As to emotional harm the court found:

> I think Tim has—aside from the litigation, Tim has acted honorably at all times towards Josh and that's why Josh loves him as much as he does and for him to—you can't just pull the plug. Otherwise there would be no such thing as equitable estoppel in paternity cases.
>
> . . . .
>
> Joshua would be terribly harmed by disestablishment. Mr. Hubbard has put himself in this position willingly, knowing the risks, knowing the situation and the favors involved, knowing what his obligations are. And he made his heart and soul available to Joshua and he can't, at this late date, withdraw from that commitment. The law does not allow it so the request for disestablishment is denied.

With respect to financial harm the court found:

> Mr. Hubbard participated in the decision to drop the [CSED] proceedings against Mr. Walters for child support. He intended to adopt Joshua. Paperwork was prepared. He participated in that. When that adoption became impractical because of the move, he swore under oath that he was Joshua's father in the Ohio documents and intended by that, among other things, to have his name put on the birth certificate as the father, which apparently has happened. And he continued to act as a father toward Joshua in every way.
>
> . . . .

All the elements of estoppel are present and it is strong evidence there would be financial detriment[:] the cost of interstate litigation, perhaps the risk of losing interstate litigation. Mr. Walters certainly has an estoppel argument that he could raise himself in defense of a paternity case. Whether support from Mr. Walters could be enforced, what kind of support is available to Mr. Walters with the family array that he has. We have no evidence of his income. We do have evidence that he has two older children whose support obligation would, of course, come off the top before other calculations would occur so that I think there's quite a bit of evidence that there would be financial difficulties involved in pursuing Mr. Walters for support.

The court entered its findings of fact and conclusions of law in January 2000. Timothy appeals.

## III. STANDARD OF REVIEW

In an estoppel case, the superior court's factual findings are reviewed for clear error.[3] Whether the doctrine of equitable estoppel may be applied under the facts as found is a question of law which this court reviews independently.[4]

## IV. DISCUSSION

A putative father cannot be equitably estopped from disestablishing paternity unless his child has been prejudiced by his or her reliance on the father's representations of paternity.[5] Evidence in the record supports Judge Reese's findings, which Timothy does not seriously dispute, that Timothy represented himself as Joshua's father, and that Joshua both personally and as represented by Amy reasonably relied on that representation. Resolution of this case thus turns entirely upon the question whether Joshua was prejudiced by that reliance: Timothy

---

accept this representation and conclusion for the purposes of this case.

**3.** See *Wright v. Black*, 856 P.2d 477, 479 (Alaska 1993), *overruled in part on other grounds by B.E.B. v. R.L.B.*, 979 P.2d 514, 520 n. 47 (Alaska 1999).

**4.** See *Wright*, 856 P.2d at 479 n. 2.

**5.** See *B.E.B.*, 979 P.2d at 516.

argues that Joshua was not, while Amy argues that he was.

At one time, proof that a child would be emotionally harmed by disestablishment of paternity was sufficient to show prejudice.[6] That broad standard no longer applies. Instead, evidence of *financial* harm is required to support a finding of equitable estoppel.[7]

■■■ A biological father's duty of support arises at the birth of his child.[8] The biological father's duty of support exists, moreover, even if another man's presumptive paternity has not yet been disestablished.[9] What financial harm then is sufficient to give rise to an estoppel against a stepfather which requires the stepfather to make child support payments after his divorce from the children's mother? While each case is fact sensitive, our case law and a case on which we relied in *B.E.B.* provide some useful standards and illustrations.

In *Wright v. Black* we noted that financial detriment would exist where "the child is deprived of the mother's potential action to hold the natural father responsible for the support of the child; ..."[10] While that may be the typical example of sufficient financial harm, the lead case on which we relied in *B.E.B.*, *Miller v. Miller*,[11] went into more detail:

> To prove equitable estoppel, the custodial parent has the burden to establish not only representation of support and reliance but also detriment, *i.e.*, that the children will suffer future financial detriment as a result of the stepparent's representation or conduct that caused the children to be cut off from their natural parent's financial support....

For example, at the final hearing if the custodial parent demonstrates that he or she (1) does not know the whereabouts of the natural parent; (2) cannot locate the other natural parent; or (3) cannot secure jurisdiction over the natural parent for valid legal reasons, and that the natural parent's unavailability is due to the actions of the stepparent, a trial court could hold that the stepparent is equitably estopped from denying his or her duty to support the children.

If, as in the present case, the wife knows where the natural father is, she has the burden to bring him before the court and to seek child support from him. Once in court the burden is on the natural father to show why he should not, in equity, be required to pay child support for his children. If the court finds that the natural father should not be required to pay child support due to the stepfather's conduct, the natural father having relied thereon and having placed himself in such a position that he is unable to meet that obligation, the stepparent should be responsible for the children's continued support. This, of course, is subject to modification or change whenever the natural father can meet his obligation....

---

6. *See Wright*, 856 P.2d at 481.

7. *B.E.B.*, 979 P.2d at 520. There are a number of reasons for the rule requiring financial prejudice. As we explained in *B.E.B.*:

> The duty of support has traditionally been rooted in the biological ties between a parent and a child. This well-accepted principle weighs heavily in favor of a rule that makes estoppel the exception, not the norm. Yet under [the] broad emotional harm standard, the exception would dominate: "To rule ... that the exception applies whenever a child has reached an age when he or she could have a meaningful appreciation of paternity would make the exception the rule and the rule applicable only to one and two year olds."

*Id.* at 519 (footnote omitted). Moreover, requiring a non-biological father to assume a post-divorce support obligation is unlikely to encourage a lasting bond between the non-biological father and the child. By contrast, estoppel based on emotional harm may discourage the husband of the mother of the child from assuming a parent-like role during the marriage. For these reasons we concluded in *B.E.B.* "that the risk of emotional harm inherent in severing a child's relationship with a psychological parent cannot itself suffice as a basis for invoking the doctrine of paternity by estoppel; to support a finding of estoppel, the evidence must show financial prejudice." *Id.* at 520.

8. *See State, Dep't of Revenue, Child Support Enforcement Div. v. Kovac*, 984 P.2d 1109, 1112 (Alaska 1999).

9. *See id.*

10. 856 P.2d 477, 481 (Alaska 1993).

11. 97 N.J. 154, 478 A.2d 351 (1984).

It is only when a stepparent by his or her conduct actively interferes with the children's support from their natural parent that he or she may be equitably estopped from denying his or her duty to support the children.... If a stepparent marries a divorced parent who is not receiving any child support, or if during their marriage the natural parent stops paying child support without interference from the stepparent, the stepparent does not thereby inherit the permanent support obligations of the nonpaying natural parent. The stepparent must take positive action interfering with the natural parent's support obligation to be bound.[12]

In the present case the facts support an estoppel based on, to use the language of *Miller*, Timothy's "positive action interfering with the natural parent's support obligation...." As noted, as a consequence of a child support enforcement action, Walters had signed an agreement agreeing to pay child support of $500 per month. Amy testified that she had this action withdrawn "at the urging of" Timothy. Her testimony was confirmed by Amy's aunt, Nancy Biggerstaff, with whom the family lived while in Anchorage. She testified that Timothy and Amy "wanted [Walters] out of the picture." She also stated that "they had me prepare the documents ... the consent to adopt and of relinquishment. We forwarded that to [Walters]." These facts adequately support the finding of the trial court that Timothy participated in the decision to terminate the child support proceedings against Walters. Taken together with the cost and uncertainty of reinstituting support proceedings against Walters as found by the trial court we conclude that the record supports the trial court's conclusion that the financial harm element of estoppel has been satisfied.

## V. CONCLUSION

For the reasons stated the judgment of the superior court is AFFIRMED.

12. *Id.* at 358–59.