*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NICKCOLE E. MOORE, | ) | |
| | ) | Supreme Court No. S-16375 |
| Appellant, | ) | |
| | ) | Superior Court No. 1KE-10-00676 CI |
| v. | ) | |
| | ) | O P I N I O N |
| FORREST W. MCGILLIS, | ) | |
| | ) | No. 7217 – January 12, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, William B. Carey, Judge.

Appearances: Allison Mendel and John J. Sherman, Mendel Colbert & Associates, Inc., Anchorage for Appellant. Blake M. Chupka, Chupka Currall LLC, Ketchikan, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

CARNEY, Justice.

## I.    INTRODUCTION

A mother moved to modify an existing custody arrangement with her ex-husband. She asked that she be given primary custody of their daughter and that the ex-husband's visitation rights and legal custody over her son — the ex-husband's stepson — be terminated. The trial court denied her motion and found that, given the recent intervention of the stepson's biological father, the ex-husband's obligation to pay child support was terminated.

We affirm the trial court's denial of the modification motion with regard to the daughter. But we hold that the legal intervention of a previously absent biological parent constitutes a substantial change in circumstances as a matter of law, and accordingly we reverse the trial court's denial of the modification motion for the son and remand for best interests findings under AS 25.24.150(c). Finally, we hold that a psychological parent's child support obligation continues so long as that parent maintains some custody of the child, and reverse the trial court's absolution of the ex-husband's child support obligation.

## II.    FACTS AND PROCEEDINGS

### A.    Prior Modification Motions

Nickcole Moore and Forrest McGillis were married in Ketchikan in 2006. Nickcole had a son from a previous relationship, born in 2004. The son's biological father, Jeremy Thompson, had been absent since the son's birth. In 2007 Nickcole and Forrest had another child, a girl.

In November 2010 Forrest filed a petition for divorce. The superior court issued a decree of divorce in December 2011 after a two-day hearing. The court awarded the parents shared legal custody of both children. Forrest received primary physical custody of their daughter in Ketchikan, while Nickcole, who had since moved to Arizona and begun a new relationship, received primary custody of her son. The court found that Forrest had established himself as the boy's psychological father,[1] and awarded him visitation with the son in Ketchikan for four weeks every summer and two weeks during

---

[1]    A "psychological parent" is "one who, on a day-to-day basis, . . . fulfills the child's psychological needs for an adult . . . . This relationship may exist between a child and any adult; it depends not upon the category into which the adult falls — biological, adoptive, foster, or common-law — but upon the quality and mutuality of the interaction." *Evans v. McTaggart*, 88 P.3d 1078, 1082 (Alaska 2004) (quoting *Carter v. Brodrick*, 644 P.2d 850, 853 n.2 (Alaska 1982)).

the Christmas season in alternating years.[2] Nickcole was awarded a similar arrangement with their daughter. Both parties were ordered to allow twice-per-week telephone contact with the child in the other's custody.

In May 2012 Nickcole filed a motion to modify custody, asking for "full custody" of her son and primary custody of her daughter. She alleged that the living situation in Ketchikan had deteriorated, that Forrest had prevented meaningful contact with their daughter, and that Forrest had assaulted Nickcole during the most recent custody exchange. Forrest denied the assault allegation and claimed that his living situation was "perfectly suited for the blended family being raised" by him and his girlfriend.

The court denied Nickcole's motion after a hearing. It concluded, based on recordings of the alleged assault and on witness testimony, that Nickcole had fabricated the incident and "perjured herself in court." It dismissed her other claims as unproven and exaggerated.

In May 2013 Nickcole filed a second motion to modify custody and child support, asking for primary custody of their daughter and sole custody of her son. She repeated a number of allegations regarding Forrest's "chaotic" living environment and his refusal to facilitate contact with the children, and added that the recent reappearance of Jeremy Thompson, her son's biological father, should be considered a changed circumstance warranting modification.

The court denied Nickcole's motion without a hearing. It found her allegations regarding contact and Forrest's living conditions unsupported and stated that

---

[2]     "To be awarded custody a 'non-parent must show that the child would suffer clear detriment if placed in the custody of the parent.' " *Osterkamp v. Stiles*, 235 P.3d 178, 185 (Alaska 2010) (quoting *Evans*, 88 P.3d at 1085).

the reappearance of the son's biological father and his increased contact with the son "[did] not mean that . . . custody . . . needs to be modified."

In May 2015 Jeremy filed a "Petition to Intervene in Custody Action and Request for Allocation of Parental Rights and Responsibilities" as the son's biological father. Shortly thereafter Nickcole filed a third motion to modify custody, seeking to terminate Forrest's visitation rights to the son and once more asking for primary physical custody of their daughter. She alleged that Forrest's relationship with her son had diminished, that Jeremy had since developed a "strong relationship" with the son, that Forrest's living situation had "deteriorated" since the original custody order, and that Forrest was "interfering with Nickcole's right to telephone contact with [their daughter]."

Forrest opposed Nickcole's motion, but agreed that Jeremy could intervene and assume parental responsibilities, including Forrest's child support obligation. Nickcole objected that Forrest could not both maintain custody of the son and absolve himself of his support obligation.

The court granted Jeremy's petition to intervene, scheduled a hearing on Nickcole's motion, and appointed a custody investigator.

**B.     The Modification Hearing And The Court's Findings**

At the hearing the custody investigator testified and recommended that physical custody remain largely within the status quo: primary physical custody of the son with Nickcole and primary physical custody of the daughter with Forrest. But he also recommended that Nickcole be awarded sole legal custody of her son, and suggested "fine-tuning" the custody schedule to reduce the son's summer visitation in Ketchikan to three weeks to better reflect the child's developing preferences. The custody investigator testified that the children had grown accustomed to their alternating, dual-household lifestyle, and that the primary concern for the parents should be maintaining stability. Although the parents offered two different types of home — Forrest living with

extended family in Ketchikan, Nickcole with a nuclear family in Phoenix, Arizona —
the custody investigator testified that neither environment was superior to the other and
that both children appeared to be doing well in their respective homes.

The custody investigator also testified that Forrest and Nickcole were
ineffective communicators. He described Nickcole as more willing to facilitate phone
contact between Forrest and the children, and Forrest had confirmed to the investigator
that his phone contact with the son had been "less than adequate."

Nickcole testified that Forrest's contact and relationship with her son had
been diminishing over time and that the son was now less interested in speaking to
Forrest than in speaking to Jeremy, with whom he communicated often. She stated that
Forrest had not allowed her to contact their daughter as the custody order required. She
claimed that she was only able to speak to their daughter once every two to three weeks
although she tried to call twice a week. She also argued that Forrest's new work
schedule — 2 p.m. to 10 p.m. on weekdays — kept him from the children even when
they were visiting with him.

The court found that Nickcole had not demonstrated a substantial change
in circumstances as to the daughter. Nickcole's problems communicating with Forrest,
it found, were partly due to Nickcole's "rather rigid and self-righteous attitude," and
were "nothing new." The court then proceeded to "consider the physical, emotional,
mental, religious, and social needs of the child," and concluded that there was no
indication that Forrest's care of their daughter was unsatisfactory. The court found that
both children had "adjusted" to the living situations and each "lived in a stable and
satisfactory environment."

The court made no express finding regarding changed circumstances as to
the son. It instead repeated its previous finding that Nickcole had fabricated an act of
domestic violence in an effort to gain an advantage over Forrest in custody proceedings,

and concluded that Nickcole was "just hell bent on terminating the relationship between [her son] and [Forrest]." Based on the testimony of the custody investigator, the court found that Forrest's parental relationship with the son continued "despite [Nickcole's] best efforts."

The court ordered that the summer visitation schedule be changed from an equally divided four weeks in Alaska and Arizona for both children to three weeks in Alaska, five weeks in Arizona, to accommodate "[the son's] other interests and needs." The court "adopt[ed] all of the other recommendations by [the custody investigator] with respect to how the parties should communicate and such." It did not address the recommendation that Nickcole be given sole legal custody of her son.

At Nickcole's request the court repeated the custody order's requirements for telephone contact. It warned Forrest that Nickcole and their daughter were to "have two calls a week and that's actual communication," or Forrest "could be subject to being held in contempt of court."

The court ordered the parties to brief the issue of Forrest's child support obligation. The court then issued written findings. It found that Nickcole had not demonstrated any change in circumstances with regard to their daughter, and that she had not shown that Forrest and their daughter's new living situation with Forrest's girlfriend and her family "had a negative impact on [the daughter]." It also found that her claim that Forrest's new work situation prevented him from spending sufficient time with their daughter was "simply not supported by the evidence."

The court once more made no express changed circumstances finding with regard to the son. It instead dismissed Nickcole's claims about "the dissolution of the relationship between [her son] and [Forrest]" as "the result of a concerted and highly cynical effort on the part of [Nickcole] to create that result." The court ruled that Nickcole's efforts notwithstanding, Forrest "still loves and cares about the boy and wants

what is best for him." The court considered the introduction of Jeremy into the son's life to be an effort by Nickcole to "place one more obstacle between [her son] and [Forrest]."

The court repeated its revised visitation schedule for the children and restated its order that "[the daughter] is to have 2 uninterrupted phone calls per week with her mother." "Legal and physical custody shall remain as previously set out," the court concluded.

The court then ruled that even though Forrest continued to share custody of the son, his child support obligation "effectively ceased when he acceded to [Jeremy's] intervention in this matter and [Jeremy's] request to have parental rights and obligations imposed."

Nickcole appeals.

## III. STANDARD OF REVIEW

"We review a trial court's child custody modification decision deferentially, reversing the decision only when the lower court abused its discretion or when its controlling findings of fact were clearly erroneous."[3] "The court's broad discretion extends to its determination whether, following an evidentiary hearing, the moving party has proven a substantial change in circumstances, meaning one that affects the child's welfare."[4] "Abuse of discretion is established if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated

---

[3] *Collier v. Harris* (*Collier II*), 377 P.3d 15, 20 (Alaska 2016) (quoting *McLane v. Paul*, 189 P.3d 1039, 1042 (Alaska 2008)).

[4] *Id.* (citing *Heather W. v. Rudy R.*, 274 P.3d 478, 482 (Alaska 2012)).

factors, or assigned disproportionate weight to particular factors while ignoring others."[5] Certain events may amount to changed circumstances as a matter of law.[6]

Trial courts similarly "have broad discretion in deciding whether to modify child support orders," and we will "review a trial court's determination of whether to modify child support for an abuse of discretion."[7] But this court "independently review[s] whether the trial court has applied the correct legal standard in determining a child support obligation."[8]

## IV. DISCUSSION

### A. The Trial Court Did Not Abuse Its Discretion In Finding No Substantial Change In Circumstances Relating To The Parties' Daughter.

Nickcole argues that the superior court abused its discretion in finding that there was no substantial change in circumstances regarding their daughter. We disagree.

Alaska Statute 25.20.110(a) allows for modification of a custody order "if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child." The change in

---

[5] *Id.* (quoting *Chesser-Witmer v. Chesser*, 117 P.3d 711, 715 (Alaska 2005)).

[6] *See Barrett v. Alguire*, 35 P.3d 1, 6 (Alaska 2001) (stating that a "custodial parent's decision to move out of state [with the children] amounts to a [substantial] change in circumstances as a matter of law" (alteration in original) (quoting *Acevedo v. Liberty*, 956 P.2d 455, 457 (Alaska 1998))).

[7] *Wilhour v. Wilhour*, 308 P.3d 884, 887 (Alaska 2013) (citations omitted).

[8] *Sawicki v. Haxby*, 186 P.3d 546, 550 (Alaska 2008) (citing *Beaudoin v. Beaudoin*, 24 P.3d 523, 526 (Alaska 2001)).

circumstances must be "substantial,"[9] "affect[] the child's welfare,"[10] and be "demonstrated relative to the facts and circumstances that existed at the time of the prior custody order that the party seeks to modify."[11] When analyzing the child's best interests the court should look to "the statutory factors enumerated in AS 25.24.150(c)."[12]

Of the changes that Nickcole alleged, the most significant were Forrest's new work schedule and family arrangements. Since the 2011 custody order, Forrest and his daughter had been living with his girlfriend and her large family. He had also been working an evening shift from 2 p.m. to 10 p.m. The daughter reportedly told the custody investigator that "she finds her dad preoccupied either . . . away at work or when he's in the home that he's busy preparing meals or doing things for the family."

But the trial court was within its discretion to find these changes insufficient to warrant a modification of custody because they did not demonstrate any material negative impact on the child. A substantial change in circumstances must be "one that affects the child's welfare."[13] And although Forrest's time with his daughter had decreased since 2011, Nickcole failed to show that this had resulted in any material disruption to what the custody investigator described as an otherwise stable existence in Ketchikan. The custody investigator's recommendations and testimony support the court's finding that no substantial change in circumstances had occurred with regard to the daughter's welfare, despite the changes in Forrest's work hours and family life.

---

[9] *Collier v. Harris* (*Collier I*), 261 P.3d 397, 403 (Alaska 2011).

[10] *Collier II*, 377 P.3d at 20 (citing *Heather W.*, 274 P.3d at 482).

[11] *Collier I*, 261 P.3d at 403 (quoting *Peterson v. Swarthout*, 214 P.3d 332, 340-41 (Alaska 2009)).

[12] *Collier II*, 377 P.3d at 20 (quoting *Heather W.*, 274 P.3d at 482-83).

[13] *Id.*

Nickcole also argues that the court failed to account for her difficulty contacting her daughter. But the court admonished the parties to "communicate better," warned Forrest that he could be held in contempt for failing to facilitate Nickcole's calls, and repeated its order that "[the girl] should have 2 uninterrupted phone calls per week with her mother." We have held that denial of telephone visits is "a serious issue," and may constitute a significant change in circumstances justifying modification of custody.[14] But we have also held that a court should not order a change in custody for violations of custody orders "until [it] has explored less intrusive means of obtaining compliance."[15] And we have stated that the appropriate response to a party's failure to abide by a court order "is to seek an order directing the non-compliant party to comply."[16] Although Nickcole testified that she was only able to speak with her daughter once every two or three weeks, not the twice-weekly calls that the court ordered in 2011, the record does not show that Nickcole ever filed a motion to compel Forrest's compliance. The superior court was thus within its discretion to focus on enforcement of the present order rather than address it through custody modification.

Nickcole also claims that the court wrongfully analyzed the circumstances from the date of her previous motion, rather than from the 2011 custody order that she actually sought to modify.[17] She points to the court's statement that her communication

---

[14]   *Hunter v. Conwell*, 276 P.3d 413, 421 (Alaska 2012).

[15]   *Vachon v. Pugliese*, 931 P.2d 371, 379 (Alaska 1996).

[16]   *Collier I*, 261 P.3d at 406 (quoting *Peterson*, 214 P.3d at 341 n.28).

[17]   *See Barrett v. Alguire*, 35 P.3d 1, 5-6 (Alaska 2001) ("The required change in circumstance . . . must be demonstrated relative to the facts and circumstances that existed at the time of the prior custody order that the party seeks to modify." (quoting *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000))).

problems with Forrest were "nothing new," and contends that such a statement could refer only to her previous motions.

But nothing in the context of the superior court's statement suggests that the court was not referring back to the 2011 order, and both parties had testified at the original custody trial to similar communication problems. Although in its written findings the court did at times refer to Nickcole's previous motions to modify, we are persuaded that this did not skew the court's analysis. The court analyzed Nickcole's alleged changes on their merits and concluded that Nickcole had not shown sufficient negative impact on her daughter to warrant modification of the existing custody arrangement. This analysis was grounded in the custody investigator's testimony, and the court's decision was within its discretion.

**B.** **The Intervention Of The Son's Biological Father Amounted To Changed Circumstances As A Matter Of Law.**

Nickcole argues that the superior court abused its discretion in failing to find that the circumstances underlying its original custody order for her son had changed. She places special significance on the reappearance of her son's biological father and Forrest's diminished role in the son's life.

The court did not make any findings about changed circumstances when it denied Nickcole's motion to modify her son's custody. Instead it noted the changes she alleged — the son's growing estrangement from Forrest and the intervention of Jeremy — and discounted their significance by attributing them to "a concerted and highly cynical effort on the part of [Nickcole]."

We reverse this part of the superior court's order. Just as a parent's move out of state with a child constitutes changed circumstances as a matter of law,[18] we hold

---

[18]     *Id.* at 6 (citing *Acevedo v. Liberty*, 956 P.2d 455, 457 (Alaska 1998)).

that the intervention of a previously absent biological parent is likewise a changed circumstance that requires the court to weigh the child's best interests and fashion an appropriate custody arrangement in light of the change. We remand for the trial court to consider the son's best interests in light of Nickcole's motion to modify both his physical and legal custody, which "deserve separate analysis."[19]

## C. It Was Error To Terminate Forrest's Support Obligation While He Retained Legal Custody.

Nickcole argues that the trial court erred in terminating Forrest's child support obligation to her son, and argues that even though Jeremy has intervened, Forrest continues to have a support obligation because of his continuing legal custody of her son. We agree with Nickcole and reverse the trial court's decision absolving Forrest of his support obligation.

"A biological father's duty of support arises at the birth of his child."[20] A stepparent, meanwhile, generally does not acquire a support obligation toward a stepchild purely by virtue of becoming his or her stepparent.[21] Even stepparents who have acted as psychological parents during a marriage are generally not subject to post-marital child support obligations when the stepparent seeks to disestablish the parental relationship.[22]

---

[19] *Collier II*, 377 P.3d at 15, 20.

[20] *Hubbard v. Hubbard*, 44 P.3d 153, 156 (Alaska 2002).

[21] *See Dewey v. Dewey*, 886 P.2d 623, 625 (Alaska 1994) ("At common law, a stepparent-stepchild relationship imposes no obligations and confers no benefits on either the stepparent or the child." (quoting *Burgess v. Burgess*, 710 P.2d 417, 422 (Alaska 1985))).

[22] *See Hubbard*, 44 P.3d at 156 n.7 ("[R]equiring a non-biological father to assume a post-divorce support obligation is unlikely to encourage a lasting bond between
(continued...)

But Forrest has not sought to disestablish his parental relationship to the son here. The trial court found that he has continued to act as the boy's psychological father, and Forrest has fought for and obtained continued physical and legal custody of the child. We have stated that those with legal custody of a child are obliged to support that child: "It would be strange if a child's permanent legal custodian(s) did not have such a duty, at least while they retained custody; otherwise a grant of custody to a nonparent would leave a child with no one in its home legally obliged to support it."[23] Other courts too have noted the connection between custody of a child and the obligation to support.[24]

Because Forrest remains the psychological father of the son, and because he retains legal custody, he also retains a support obligation — the intervention of the son's biological father notwithstanding. We therefore reverse the trial court's decision. But we note that Forrest's custody arrangement may change on remand with the superior court's analysis of the best interests factors under AS 25.24.150, and that determination may affect Forrest's support obligation.

---

[22]    (...continued)
the non-biological father and the child."); *B.E.B. v. R.L.B.*, 979 P.2d 514, 520 (Alaska 1999) (holding that "the risk of emotional harm inherent in severing a child's relationship with a psychological parent cannot itself suffice as a basis for invoking the doctrine of paternity by estoppel").

[23]    *C.R.B. v. C.C.*, 959 P.2d 375, 385 n.24 (Alaska 1998) (disapproved on other grounds by *Evans*, 88 P.3d at 1085).

[24]    *See Stein v. Stein*, 831 S.W.2d 684, 689 (Mo. App. 1992) (noting that a "[h]usband was obligated to support [the] child as long as he retained legal custody"); *A.S. v. I.S.*, 130 A.3d 763, 765 (Pa. 2015) ("[W]hen a stepparent takes affirmative legal steps to assume the same parental rights as a biological parent, the stepparent likewise assumes parental obligations, such as the payment of child support."); *In re Marriage of Farrell*, 835 P.2d 267, 271 (Wash. App. 1992) (holding that a stepparent's support obligation terminated once "the stepparent is no longer 'custodial' ").

## V. CONCLUSION

We AFFIRM the trial court's denial of Nickcole's motion with regard to the parties' daughter. We REVERSE its ruling as to the son's changed circumstances and REMAND so it can conduct a best-interests analysis. We also REVERSE the trial court's absolution of Forrest's support obligation, and REMAND for proceedings consistent with this opinion.