174 S.W.3d 502 (2005)
S.R.D., Appellant,
v.
T.L.B., Formerly T.L.D., Appellee.
No. 2004-CA-001309-MR.
Court of Appeals of Kentucky.
September 2, 2005.
Case Ordered Published by Court of Appeals October 14, 2005.
*503 David L. Vish, Louisville, KY, for appellant.
John H. Helmers, Jr., Troy DeMuth, Louisville, KY, for appellee.
Before HENRY, McANULTY, and MINTON, Judges.

OPINION
MINTON, Judge.
A finding in the divorce decree recognized the uncontested assertion that the marriage of S.D. and T.B. produced three minor children. The decree also incorporated a joint custody agreement that designated T.B. as primary residential custodian and obligated S.D. to pay child support. Six years post-decree, S.D. moved the family court to set aside the parentage finding as to the youngest child because DNA testing confirmed that she was not his child. Although S.D. wanted to continue in his role as a father to the child in every way except for the financial support of the child, the family court denied S.D.'s motion to end child support. Relying on equitable estoppel principles, the family court concluded that S.D. waited too long to deny his full role as parent. Consistent with the best interests of the child standard, the family court concluded that any financial or emotional disruption of the parent-child relationship with the youngest child would be seriously detrimental to all three children. We find no abuse of discretion by the family court and affirm the order.
S.D. and T.B. were married in 1988. During the marriage, T.B. gave birth to three children: R.D., born December 9, 1989; B.D., born February 21, 1993; and H.D., born May 17, 1995. Although T.B. "threatened and intimated" to S.D. during their marriage that he was not H.D.'s father, S.D. treated each of the three children as his own. In his petition for dissolution, S.D. alleged that R.D., B.D., and H.D. were all born of the parties' marriage; T.B. did not deny the allegation. And on dissolution of the marriage, S.D. agreed to joint custody and to pay child support for all three children.
For over six years after the divorce, S.D. did not challenge his paternity of H.D. But for reasons undisclosed in the record, in November 2003, S.D. had all three of the children DNA tested. The results indicated that while there was a 99.98 percent probability S.D. was the biological father of R.D. and B.D., there was no chance he was H.D.'s natural father.[1]
*504 Despite this knowledge, S.D. entered into an agreed order on January 22, 2004, modifying the existing parenting schedule for all three children and indicating his desire to continue in his paternal role. The parties also agreed to meet with Mitch Charney, a court-ordered parenting coordinator.
In Charney's report to the family court, he acknowledged that DNA testing proved S.D. was not the biological father of H.D. Charney also noted that S.D. stated he was only willing to continue child support for R.D. and B.D. but wanted to have visitation and a parental relationship with all three children. Based on this information, Charney stated he felt it was "too late for [S.D.] to deny his role as a parent." Therefore, Charney recommended that S.D. maintain his present financial and custodial role. Charney further noted that if the court chose to relieve S.D. of his financial responsibilities towards H.D., he should also be relieved of his parental rights and that T.B. should be given the sole care, custody, and control of the child. Under this circumstance, Charney cautioned that the court should arrange for "appropriate mental health intervention" for all three children.
S.D. responded to Charney's report with a CR 60.02 motion to set aside the original finding declaring him to be H.D.'s biological father and with exceptions to the report itself. In his motion, S.D. argued that he "has no legal obligation to pay support for [H.D.], as he is not her biological father. However, [he] is the only father [whom] [H.D.] has ever known and to deny her the right to have visitation with him would cause her irreparable harm." This arrangement, S.D. argued, was in H.D.'s best interest.
The family court denied S.D.'s motion. Agreeing with Charney's recommendations, the court stated that "there is no doubt that the best interest of the child is for the father-daughter relationship to continue in the same manner as it has to this point in time. Any disruption in that relationship, financial or emotional[,] would pose potentially serious ramifications for the child." The court also ruled that S.D. was estopped from seeking relief under CR 60.02(d) and (f) "in light of his own behavior." Because S.D. had held himself out as H.D.'s father for over nine years,[2] even after the paternity test revealed otherwise, the court concluded that S.D. was H.D.'s legal father. As such, the court denied S.D.'s motion, reasoning that to do otherwise "would not be in the best interest of the child and could result in serious detriment to her, contrary to statutory law and public policy."
S.D. argues on appeal to this Court that the Jefferson Family Court abused its discretion by denying his CR 60.02 motion. S.D. claims "that pursuant to CR 60.02(d) and (f) the trial court had the clear authority to set aside the previous order of support as it pertained to the youngest child [H.D.]."
In two published opinions, this Court has held that a CR 60.02 motion is a proper vehicle for challenging a judgment of paternity. In Cain v. Cain,[3] a man filed a motion under CR 60.02(d) twelve years *505 after entry of the decree of dissolution. The motion came in response to allegations made two years earlier by the man's ex-wife that he was not the biological father of their youngest son. We held that the two-year lapse between the man learning of his questionable paternity and the filing of the CR 60.02 motion was a reasonable amount of time. And we concluded that the motion was proper and paternity could be reconsidered.
In Spears v. Spears,[4] a married couple separated in June 1975 but did not petition for divorce until 1985. The husband testified that the parties had no children; however, the wife filed an entry of appearance wherein she claimed a daughter was born of the marriage in August 1975. The husband allegedly had no knowledge of the child and had never acknowledged the child as his own. The trial court granted the divorce and concluded that because the child was born of the marriage, the husband was presumed to be the biological father. On appeal, we reversed, concluding that because the husband had never held himself out as the child's father and because no demand had ever been made on him for support, "it would be highly unfair and unjust" to refuse the CR 60.02 motion.
The facts of our case are distinguishable from the facts presented in Cain and Spears. In Cain, the father waited two years after learning he may not be his child's natural parent before filing his CR 60.02 motion to reconsider paternity; here, S.D. waited over six years after he was first put on notice that he may not be H.D.'s father before filing his petition. In an affidavit filed before the family court, S.D. noted that T.B. informed him during the course of their marriage when H.D. was two years old that he may not be the child's father. Because he "could not deal with it and chose not to deal with it," he did not have DNA tests performed at that time. In fact, he waited some six years, until 2003, to file his CR 60.02 motion.
In Spears, the father never held himself out as the child's father; rather, he first became aware of his child's existence some ten years after the child was born. In the case at hand, S.D. assumed the role of H.D.'s father from the time she was born.
Moreover, S.D. has not established the grounds necessary under CR 60.02(d) or (f) to relieve him of his child support obligation. Under CR 60.02(d), a party must prove "fraud affecting the proceedings, other than perjury or falsified evidence" to obtain relief from a final judgment. S.D. argues T.B. perpetrated a fraud upon the court by failing to deny in her response to his allegation in the divorce petition that three children were born of the marriage. But S.D. himself made the allegation in his verified petition for divorce, even though he was previously notified by T.B. that he might not be H.D.'s father.
Further, CR 60.02(f) provides relief when there is proof of "any other reason of an extraordinary nature justifying relief." We do not believe this situation is of such an "extraordinary nature" to grant S.D.'s motion. As noted, S.D. had knowledge, albeit constructive knowledge, that H.D. may not be his child. Yet, he continued to portray himself as her father. The fact that he "chose not to deal" with the situation until some six years after he first learned of his questionable parentage does not, in our minds, constitute a reason of an extraordinary nature.
While we agree that the trial court had "clear authority" under CR 60.02 to set aside the previous order of support, it *506 was within the court's discretion not to exercise that authority. Rather than grant S.D.'s motion, the court held that S.D. was "estopped from seeking relief pursuant to CR 60.02(d) and (f) in light of his own behavior." We agree with this conclusion.
Kentucky courts have yet to apply the doctrine of estoppel to a paternity dispute. We believe the matter presents an important issue of first impression; therefore, we will discuss the implications fully.
The substance of S.D.'s argument is best summarized in his own words, as follows:
In the case at bar as [S.D.] is not the biological father of [H.D.] he should not be under a court order to pay support for said child and he should have an order entered stating that he is not her biological father.
However, [notwithstanding] his position on this issue, the [sic] [S.D.] wishes the court to realize that he loves [H.D.] and he wants to continue to have a relationship with her. He does not wish to disrupt her life or for her to think he loves her any less than her two older siblings. This is why [S.D.] wants to continue to be an integral part of her life and to continue to have rights of visitation.
Kentucky adheres to the "presumption of legitimacy," which assumes that a child born during lawful wedlock is the product of the husband and the wife.[5] This presumption is not conclusive.[6] "`Though the presumption of paternity and legitimacy is one of the strongest known to law, it ... is rebuttable and may be overcome by factual evidence.'"[7] The evidence necessary to overcome the presumption must be "`so clear, distinct and convincing as to remove the question from the realm of reasonable doubt.'"[8]
The doctrine of equitable estoppel is predicated upon the theory that
[w]here one has, by a course of conduct, with a full knowledge of the facts with reference to a particular right or title, induced another, in reliance upon such course of conduct, to act to his detriment, he will not thereafter be permitted in equity to assume a position or assert a title inconsistent with such course of conduct, and if he does he will be estopped to thus take advantage of his own wrong.[9]
The doctrine is often stated in terms of the following factors: (1) Conduct, including acts, language and silence, amounting to a representation or concealment of material facts; (2) the estopped party is aware of these facts; (3) these facts are unknown to the other party; (4) the estopped party must act with the intention or expectation his conduct will be acted upon; and (5) the other party in fact relied on this conduct to his detriment.[10]
*507 As stated, equitable estoppel has yet to be applied to a custody dispute in Kentucky. But other jurisdictions have employed the doctrine to prevent a man who has held himself out as a child's father from denying paternity.[11]
In adopting the equitable estoppel theory in this case, we are persuaded by M.H.B. v. H.T.B.,[12] a case with a fact pattern practically indistinguishable from the present case. In M.H.B., a child, K.B., was born during wedlock. Shortly after the child's birth, the husband, Henry, became aware that he might not be the biological father. Nevertheless, for the remainder of the marriage and for five years following the couple's divorce, Henry "consistently conducted himself as the child's father, successfully gained the child's love and affection, and established himself as the little girl's parental provider of emotional and material support."[13]
As in the present case, three children were born during the couples' marriage. Although Henry questioned his paternity of K.B., he nevertheless served as joint custodian with his ex-wife, Marilyn, for all three children. And, as in the present case, Henry eventually petitioned the court *508 for primary custody of the children. Marilyn responded with a motion for an increase in child support. Shortly thereafter, Henry filed a counterclaim, alleging that he should be under no duty to provide child support for K.B. According to the Court, "[t]his was the first time that Henry had ever attempted to repudiate his paternal relationship with K.B.,"[14] even though, at this point, the child was five years old. A later paternity test revealed that Henry was not K.B.'s biological father.
In denying Henry's motion to discontinue his child support obligation, the Supreme Court of New Jersey noted that Henry had knowledge since the child's birth that he may not be the biological father; that his actions proved he "intended" to be the child's father; and that the child relied on this fact. The Court concluded that the child would suffer "irreparable harm" if Henry were permitted to disclaim his paternity. And, relying on the doctrine of equitable estoppel, the Court held that Henry was precluded from denying the duty to provide child support for his youngest child. The Court held:
By both deed and word, Henry repeatedly and consistently recognized and confirmed the parent-child relationship between himself and K.B. He acted in every way like a father toward his own child. He also stipulated to the child's paternity. At the time of his divorce he promised to pay child support, which obligation was incorporated into the judgment of divorce.
The volitional nature of Henry's conduct is underscored by Henry's persistent attempts to gain custody of K.B., efforts that he continued on appeal from the trial court's award of custody to Marilyn. He thus sought child custody even after blood tests conclusively demonstrated that, biologically, he was not K.B.'s father. Consequently, there can be no suggestion that Henry's prior actions were merely accidental or inadvertent. His actions attest to the previously well-developed father-daughter bond, and convey all possible indicia of an affirmative and purposeful representation of continuing support, which constitutes a primary element of equitable estoppel.[15]
In the present case, we agree that from a purely genetic stand point, S.D. is not H.D.'s father. But there is no doubt that a man can be a child's "legal father" without actually being her "biological father." As defined by Black's Law Dictionary, a "legal father" is simply "[t]he man recognized by law as the male parent of a child."[16] S.D. acknowledged his paternity of H.D. in both the petition for dissolution and the separation agreement. He also conducted himself as H.D.'s father for a period of over nine years. The record indicates that S.D. has continuously held himself out as H.D.'s father since the child's birth in 1995; and, as S.D. himself admits, he has played "an integral part" throughout H.D.'s life.
The factors relevant to equitable estoppel apply to this case. S.D. represented to H.D. that he was her father, even though he was aware this representation may be a biological fiction; H.D. was unaware of this fact; S.D. acted with the intention that H.D. would consider him as her father; and H.D. relied upon S.D.'s conduct to her detriment. Simply put, S.D. made a material misrepresentation to H.D., upon *509 which H.D. relied, to H.D.'s detriment and prejudice.[17]
The dissent argues that our opinion unreasonably extends the New Jersey court's decision in M.H.B. Relying on the case of J.W.P. v. W.W.,[18] the dissent claims we have compromised the obligations of H.D.'s natural father by requiring S.D. to continue providing financial support. In J.W.P., the mother, J.W.P., was involved in an extramarital affair with W.W. J.W.P. and W.W. were both married at the time, but they separated from their respective spouses and moved in with each other for several months. During the course of their relationship, J.W.P. became pregnant. But W.W. denied paternity; and J.W.P. moved back into her marital residence with her husband, J.H.P. Although J.H.P. was aware J.W.P. was pregnant with W.W.'s child, he "was still interested in preserving their marriage."[19] Six months later, J.W.P. gave birth. A paternity test later revealed that W.W. was, with all certainty, the father of J.W.P.'s child.
Although W.W. denied his paternity, he also refused to relinquish his rights to allow J.H.P. to adopt the child.[20] But when J.W.P. sought financial support from W.W., W.W. refused to comply, arguing instead that J.H.P. should be estopped from denying paternity under the presumption of legitimacy.
The New Jersey Superior Court disagreed. Citing its previous decision in Miller v. Miller,[21] the court held that the doctrine of paternity by estoppel was not "intended to compromise the natural parent's obligation."[22] Rather, estoppel should be "used to provide a safety net for the child whose stepfather has affirmatively interfered with his right to be supported by his natural father."[23] Referring to its decision in M.H.B., the court noted:
[T]he equitable estoppel doctrine articulated in Miller has been applied in cases in which a custodial mother has sought continued support for her children from their stepfather. Its application has consistently served the compelling need of the child to receive continuing financial support when the child has been effectively foreclosed from obtaining support from a natural parent by the stepfather's conduct.[24]
As the dissent notes, the record in the present case makes no mention of H.D.'s natural father. From what we can ascertain, H.D. has not met and does not know who her natural father is. We do not know if the natural father wants to be involved in H.D.'s life, or if he is even alive. The dissent asserts that the questionable *510 status of H.D.'s natural father should preclude S.D. from further financial obligations for H.D.; the dissent also claims our opinion "extends New Jersey law further than New Jersey is willing to extend its own law."
We must disagree with that contention. The facts of this case, like the facts in M.H.B., indicate that S.D.'s conduct towards H.D.i.e., continuing his role as her father, even though he had knowledge he may not beeffectively foreclosed H.D. from obtaining support from her natural father. Had S.D. chosen to conduct a paternity test at the time he first learned in 1997 that paternity was questionable, our conclusion may have differed. In that situation, H.D. would have had the opportunity to learn the identity of her natural father and, perhaps, to form a bond with him. But, as it stands, because S.D. has continuously held himself out as H.D.'s father since the child's birth, he has prevented H.D. from having a relationship, financial or otherwise, with her natural father. These facts differ from the facts in J.W.P. where the natural father was known to both parties and available to provide financial support to the child.
Therefore, we agree with the New Jersey Superior Court's reasoning in M.H.B. and hold that in light of his past behavior and previous acknowledgement of H.D. as his own child, S.D. is estopped from seeking relief under CR 60.02. We further hold that because he is estopped from seeking relief, S.D. is obligated to continue paying child support for the child. Regardless of the DNA results, S.D. is H.D.'s "male parent" under the law; and since parenthood comes with economic, as well as emotional and physical responsibilities, S.D. cannot be relieved of H.D.'s financial support.
We believe our decision clearly comports with the "best interest of the child" standard.[25] KRS 403.270 states that custody disputes shall be determined "in accordance with the best interests of the child." This standard is the guiding principle in custody determinations. As the family court found, allowing S.D. to renounce his fatherhood of H.D. and withdraw all financial support "would pose potentially serious ramifications for the child." As the California District Court of Appeals noted in Clevenger v. Clevenger:
There is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon, his bastardy. This is a cruel weapon, which works a lasting injury to the child and can bring in its aftermath social harm. The weapon should garner no profit to the wielder; the putative father should earn no premium by the assertion of the illegitimacy of the child....[26]
The relationship of father and child is too sacred to be thrown off like an old cloak, used and unwanted. We are dealing with the care and education of a child during his minority and with the obligation of the party who has assumed as a father to discharge it. The law is not so insensitive as to countenance the *511 breach of an obligation in so vital and deep a relation, undertaken, partially fulfilled, and suddenly sundered.[27]
For the foregoing reasons, we hold that the doctrine of equitable estoppel precludes S.D. from denying his paternity and child support obligations towards H.D. This decision promotes the best interest of the child. Thus, the opinion of the family court is affirmed.
McANULTY, Judge, concurs.
HENRY, Judge, dissents and files separate opinion.
HENRY, Judge, dissenting.
I respectfully dissent.
With our holding in this case, it is now the law in Kentucky that a married woman who has given birth to a child conceived in an extramarital affair need only show a possibility of emotional harm to the child in order to legally estop her husband from denying paternity even though DNA evidence proves conclusively that he cannot be the child's father. This places Kentucky at the extreme margin of the minority of states which have approved the doctrine of "paternity by estoppel." We have established this rule in this case even though the potential harmthat the child will discover that she is illegitimatehas been rendered moot by the child having been told that S.R.D. is not her real father. See n. 1 supra.
Until now, Kentucky law has consistently held that a putative father who can show that he is not biologically related to a child has no obligation for its support. In the last seventeen years, in three published cases, we have granted CR 60.02 relief from child support obligations when putative fathers were able to show conclusive scientific proof that they were not biologically related to the child. See Cain v. Cain, 777 S.W.2d 238 (Ky.App.1989); Spears v. Spears, 784 S.W.2d 605 (Ky.App.1990); and Crowder v. Commonwealth ex rel. Gregory, 745 S.W.2d 149 (Ky.App.1988). No Kentucky case holds otherwise. The attitude of our courts on this issue was expressed in Crowder as follows: "Justice is the court's constant destination, relentlessly pursued. It is not arrived at where a court in a paternity action adjudicates a man to be the father of a child while knowing full well that the biological relationship has been clearly disestablished." Crowder at 151.
In order to maintain the integrity of the family unit, spare children the legal and social stigma of illegitimacy, and cast the financial burden for child support on individuals rather than society, the common law has for many centuries recognized a presumption that children born during a marriage are children of the marriage.[28] In Kentucky this presumption is codified at KRS[29] 406.011. Although the presumption is "one of the strongest known to law," it may be overcome but "only by evidence so clear, distinct and convincing as to remove the question from the realm of reasonable doubt." Bartlett v. Commonwealth ex rel. Calloway, 705 S.W.2d 470, 472 (Ky.1986), citing Simmons v. Simmons, 479 S.W.2d 585, 587 (Ky.1972). In Bartlett, the presumption was overcome by HLA[30] testing, which established with a probability of 99.93 percent that a man *512 other than the husband was the child's father. Id. at 472; see also KRS 406.111.
In Bartlett, the child was born during wedlock; but the husband and wife had been divorced for several years. The wife filed a paternity action against the biological father, who raised the KRS 406.011 presumption as a defense. The biological father argued that the husband had never denied paternity of the child. Id. at 473. The court observed that "[f]or centuries, because it was so difficult to determine paternity, the court has always opted for the husband as the father of the child where that possibility existed." Id. at 472. In holding that the biological father was obligated to support the child instead of the husband, the court continued:
Truth and justice are irrevocably bound. They are Siamese twins sharing a single heart beat. Neither can survive very long without the other. When the advances of science serve to assist in the discovery of the truth, the law must accommodate them. The law cannot pick and choose when truth will prevail.
Id. at 473.
Many states which have adopted the doctrine of paternity by estoppel have applied the doctrine in lieu of the paternity presumption. While traditional estoppel doctrine requires three elements: (1) conduct or words amounting to representation; (2) reasonable reliance; and (3) resulting prejudice, courts have differed on what type of resulting prejudice is necessary in order to estop a party from disestablishing paternity.[31] As applied in Kentucky in other areas of law, the doctrine of equitable estoppel has been used against an opposing party and has included an element of detrimental reliance by the innocent party. See majority opinion, supra p. 506, citing J. Branham Erecting & Steel Service Company Inc. v. Kentucky Unemployment Insurance Commission, 880 S.W.2d 896, 898 (Ky.App.1994). In addition to the fact that a child is not a party to a divorce action between its parents,[32] we also face the difficulty that courts of other states have faced in deciding what kind of prejudice must be shown in order to estop S.R.D. from disestablishing his paternity.
In this case, the family court relied on the report of the parenting coordinator to the effect that if the court should "relieve [S.R.D.] of his responsibility as [H.D.'s] father, then there needs to be some plan set up for both [H.D.] and the parties' other two children, with the assistance of an approved mental health professional, as all three children will have difficult emotional issues to deal with when informed that the Petitioner is not [H.D.'s] father." The family court referred several times to the potentially serious detriment to the child if the status quo was interrupted; but no proof was placed in the record regarding the nature or extent of any emotional or psychological damage to the child, nor did the court cite any learned treatises or studies relating to such damage. The nature and extent of the damage was assumed and treated as a matter to be judicially noticed without further discussion. Having made this assumption, it was then easy for the family court to conclude that "[i]n light of the facts of this particular matter, there is no doubt that the best interest of the child is for the father-daughter relationship to continue in the same manner as it has to this point in time." While it is beyond doubt that it is shocking and traumatic for a child to learn that the person she had known as her *513 father is not biologically related to her, it is also inevitable that she will find out the truth, just as H.D. already has in this case. There are also psychological costs connected with lying to a child, and there are sound reasons why our courts should not support or condone deception. When the family court's decision was rendered, H.D. had not been told that S.R.D. was not her biological father. The family court, in essence, penalized S.R.D. for deceiving H.D. by requiring him to continue to pay child support and then ordered him to continue to deceive her in order to maintain the status quo. Legal reasoning aside, such a ruling strains common sense. How a family decides to deal internally with the mess created when one of the parents has an affair which produces a child, it seems to me, is very much their business and very little of this Court's. This Court's business in this case is primarily to determine whether, and if so upon what legal basis, we will order S.R.D. to continue to pay child support. In the final analysis that is all we are able to do. We may grant S.R.D. rights relating to H.D., but we cannot reasonably require him to avail himself of those rights if he turns against her. An order of any court directing a man to continue to "be a father" to a child, once he has learned that the child resulted from an act of infidelity by his wife, is impractical, unenforceable, and unjust.
In this connection, the Alaska Supreme Court wondered in B.E.B. v. R.L.B., 979 P.2d 514 (Alaska 1999), whether compelling the husband to continue to pay support might result in more harm than good. In that case, after thoroughly examining the "prejudice" element of paternity by estoppel in those states which follow the doctrine, the court overruled an earlier case[33] which had approved "emotional harm" as sufficient to establish the element of prejudice and ruled that thereafter it would require a finding of "financial harm." Id. at 520. To arrive at this result, the Alaska Supreme Court rejected the reasoning of Clevenger v. Clevenger, 189 Cal.App.2d 658, 11 Cal.Rptr. 707 (1961). That case approved emotional harm, without more, as sufficient to establish the prejudice element of estoppel. Clevenger's reasoning is followed by a minority of the states which have approved the doctrine of paternity by estoppel. The Alaska Supreme Court chose instead to follow the reasoning of Knill v. Knill, 306 Md. 527, 510 A.2d 546 (1986), and Miller v. Miller, 97 N.J. 154, 478 A.2d 351 (1984). In those cases, the courts of Maryland and New Jersey, respectively, rejected the Clevenger court's emotional harm standard in favor of a financial harm standard of prejudice. In discussing why emotional harm is not sufficient to invoke the doctrine of paternity by estoppel, the Miller court said:
[T]o hold otherwise would create enormous policy difficulties. A stepparent who tried to create a warm family atmosphere with his or her stepchildren would be penalized by being forced to pay support for them in the event of a divorce. At the same time, a stepparent who refused to have anything to do with his or her stepchildren beyond supporting them would be rewarded by not having to pay support in the event of a divorce.
Miller v. Miller, 97 N.J. at 168, 478 A.2d at 358.
The Alaska Supreme Court concluded that the emotional harm rule of Clevenger:
centering as it does on a child's emotional well-being after the break-up of a marriage, tacitly assumes that requiring a non-biological parent to pay post-divorce *514 support will encourage a lasting emotional bond. This assumption is highly questionable.
It is far from obvious that precluding a non-biological father from challenging paternity can effectively protect his child's emotional well-being. An order requiring the father to pay support or barring him from challenging paternity will hardly prevent him from publicly claiming that he is not actually the child's father. Of course, it is arguable that if the father knows that he will not be able to shirk his support obligation by challenging paternity, he might be deterred from attempting the challenge. But any such deterrence would be more than offset by the risk that a court order requiring the non-biological father to pay support might itself destroy an otherwise healthy paternal bond by driving a destructive wedge of bitterness and resentment between the father and his child. In short, the Clevenger rule is not grounded in reality. To encourage ongoing bonds between a non-biological father and son is certainly desirable; but, as a practical matter, Clevenger's emotional harm standard is not likely to accomplish this commendable goal.
B.E.B. v. R.L.B., 979 P.2d at 519 (emphasis added).
In our case, to make a new rule changing Kentucky law, the majority relies on M.H.B. v. H.T.B., 100 N.J. 567, 498 A.2d 775 (1985), in which an equally divided New Jersey Supreme Court affirmed a trial court's decision to apply the doctrine of paternity by estoppel. The decision was strongly criticized in the dissent for ignoring the requirement of Miller v. Miller "that when the natural parent can be located and is financially able, he or she remains principally responsible to pay permanent child support." Id., 100 N.J. at 583-584, 498 A.2d at 783-784 (Pollock, J., concurring in part and dissenting in part), citing Miller, 97 N.J. at 169, 478 A.2d at 351. In J.W.P. v. W.W, 255 N.J.Super. 185, 604 A.2d.695 (1990), a biological father asserted the marital presumption and the doctrine of equitable estoppel in an attempt to avoid his obligation to support a child he had fathered in an extramarital affair. The husband had held himself out to be the child's father even though he knew he was not. The court declined to extend the holding of M.H.B. v. H.T.B, and, referring to the paternity by estoppel doctrine adopted in Miller said that:
[t]he doctrine was not intended to compromise the natural parent's obligation. Indeed, the Supreme Court emphasized that the natural parent remained the primary recourse for child support. Rather, equitable estoppel was used to provide a safety net for the child whose stepfather has affirmatively interfered with his right to be supported by his natural father.
Id. at 255 N.J.Super. at 191, 604 A.2d at 698 (Italics in original), citing Miller v. Miller, 97 N.J. at 169-70, 478 A.2d at 351. New Jersey courts hold that paternity by estoppel should be cautiously applied and that the natural parent is primarily obligated for support if he or she can be found and is financially able to support the child. By our holding, we extend New Jersey law further than New Jersey is willing to extend its own law.
In this case, neither the report of the parenting coordinator nor the judgment of the family court makes any mention whatsoever of the natural father of H.D. Who he is, where he is, what he does for a living, whether or not he is willing or able to pay support, whether or not he wishes to be involved in H.D.'s life, or even whether or not he is alive, we cannot tell. Even though it is perfectly plain that along with T.L.B., he is the person most directly responsible for H.D.'s predicament, he appears *515 in this case only as "The Little Man Who Wasn't There."[34]
The two factors that apparently complicate this case are S.R.D.'s request to be relieved of the obligation for H.D.'s support while continuing to have parental rights and his delay in requesting a DNA test. There is no proof that S.R.D. had any reason to suspect that H.D. was illegitimate until she was already a toddler, two years old.[35] One would expect that by that time a strong bond of affection would have already formed between S.R.D. and H.D., making S.R.D.'s dread of learning the truth understandable. Around that time, the couple began having serious marital difficulty; and T.L.B. began to taunt S.R.D. with "intimations" that he might not be the child's father. Until now, such "intimations" hurled in the heat of marital strife have rarely resulted in DNA testing; but from henceforth, prudent family lawyers will advise husbands to obtain DNA tests as soon as their children are born and have nothing to do with the child if the results are unfavorable. This state of affairs hardly serves to maintain the integrity of family life.[36]
I can agree with the majority that parental rights and the obligation of support go hand-in-hand. I can admit that a sound argument can be made that S.R.D. did not file his motion for CR 60.02 relief within a "reasonable time" as we have decided that issue in other cases. I cannot agree that S.R.D. deserves to be penalized for trying to maintain the harmony of his family and for supporting H.D. as he has done until now. If the family court was unwilling to grant S.R.D.'s unusual request, it would seem that an analysis of the child's best interest would have led the court to at least consider the possibility of terminating the support obligation while granting S.R.D. liberal visitation rights, which is within the court's authority. See Simpson v. Simpson, 586 S.W.2d 33 (Ky.1979).
The prejudice element of the doctrine of paternity by estoppel, as it has been applied in all other states where the doctrine has been adopted, is completely missing in this case. No emotional harm can be shown because H.D. already knows that S.R.D. is not her natural father. No financial harm can be shown because there is no proof that any effort has been made to bring the natural father before the court and determine his ability or willingness to pay support. Even if it was shown that Kentucky law would be improved by the adoption of paternity by estoppel, which I submit is a dubious premise,[37] this is not the case by which to do it. I respectfully dissent.
NOTES
[1] According to S.D.'s affidavit, filed on May 20, 2004, he and T.B. entered into an "Agreed Confidentiality Statement" in which they recited their agreement not to disclose the DNA test results to any of the children. But during oral argument, counsel revealed that the parties had recently told H.D. that S.D. was not her biological father.
[2] The dissent disagrees with our conclusion that S.D. has held himself out as H.D.'s father for over nine years. H.D. was born in 1995. S.D. continued to portray himself as H.D.'s father until sometime in either 2004 or 2005, after he filed this appeal. Therefore, according to our calculations, S.D. has portrayed himself to H.D., her siblings, and to the public as H.D.'s father for over nine years.
[3] 777 S.W.2d 238 (Ky.App.1989).
[4] 784 S.W.2d 605 (Ky.App.1990).
[5] Kentucky Revised Statutes (KRS) 406.011.
[6] Bartlett v. Commonwealth, 705 S.W.2d 470, 472 (Ky.1986).
[7] Id. at 472, quoting Tackett v. Tackett, 508 S.W.2d 790 (Ky.1974); see also, KRS 406.011, which states that "a child born out of wedlock includes a child born to a married woman by a man other than her husband where evidence shows that the marital relationship between the husband and wife ceased ten (10) months prior to the birth of the child."
[8] Bartlett, 705 S.W.2d at 472, quoting Simmons v. Simmons, 479 S.W.2d 585 (Ky.1972).
[9] Farmer v. Gipson, 201 Ky. 477, 257 S.W. 1, 2 (Ky.1923).
[10] J. Branham Erecting & Steel Service Company, Inc. v. Kentucky Unemployment Insurance Commission, 880 S.W.2d 896, 898 (Ky.App.1994).
[11] See J.C. v. J.S., 826 A.2d 1 (Pa.Super.Ct.2003) (petitioner who held himself out as child's biological father for approximately six years, even though he knew he was not the child's father, was estopped from later denying his child support obligations); Monmouth County Division of Social Services v. R.K., 334 N.J.Super. 177, 757 A.2d 319 (N.J.Super.2000) (man who acted as psychological father to ex-girlfriend's children was equitably estopped from denying paternity even though DNA tests revealed he was not the biological father); Crago v. Kinzie, 106 Ohio Misc.2d 51, 733 N.E.2d 1219 (Ohio Misc.2000) (putative father's "voluntary and unequivocal" actions towards children from the time of their birth constituted a "binding acknowledgement" and estopped him from denying paternity); Pietros v. Pietros, 638 A.2d 545 (R.I.1994) (father was equitably estopped from denying paternity based on his past conduct even though DNA tests proved he was indisputably not the child's father); D.L.B. v. D.J.B., 814 P.2d 1256 (Wyo.1991) (father equitably estopped from denying paternity after he acknowledged paternity on child's birth certificate and voluntarily promised to pay child support); Nygard v. Nygard, 156 Mich.App. 94, 401 N.W.2d 323 (Mich.Ct.App.1986) (petitioner, who assumed status as child's father from time of birth until child was ten-years-old, estopped from denying paternity); Wade v. Wade, 536 So.2d 1158 (Fla.Dist.Ct.App. 1988) (father who signed child's birth certificate, "had the child baptized as his son, carried the son as a military dependent and as a dependent for income tax purposes, and named the child as his son in his will," even though he knew he was not the biological father, estopped from denying paternity); In re Marriage of Johnson, 88 Cal.App.3d 848, 152 Cal.Rptr. 121 (Cal.Dist.Ct.App.1979) (father estopped from denying paternity after acknowledging and holding son out as his own for almost seven years); but see Quintela v. Quintela, 4 Neb.App. 396, 544 N.W.2d 111 (Neb.App.1996) (father, who shared household with non-biological child for less than one year, not equitably estopped from denying paternity upon divorce from child's mother as there was no proof of detriment to the child); Berrisford v. Berrisford, 322 N.W.2d 742 (Minn.1982) (father not estopped from denying paternity where relationship with child was short-lived and child could not have known of father's misrepresentations).

Several courts have refused to apply the estoppel doctrine without proof that the father's denial of paternity would result in economic detriment to the child. See B.E.B. v. R.L.B., 979 P.2d 514 (Alaska 1999) (holding that doctrine of "paternity by estoppel" may not be employed without proof of financial detriment or prejudice); Knill v. Knill, 306 Md. 527, 510 A.2d 546 (Md.1986) (father not estopped from denying paternity of child without proof of financial detriment to the child); Wiese v. Wiese, 699 P.2d 700 (Utah 1985) (father not estopped from denying paternity when there was no proof that father's actions precluded son from pursuing a child support claim against his biological father).
[12] 100 N.J. 567, 498 A.2d 775 (N.J.1985).
[13] Id. at 775.
[14] Id. at 777.
[15] Id. at 778.
[16] BLACK'S LAW DICTIONARY (8th ed. 2004).
[17] The dissent makes much of the fact that H.D. is not a "party" to her parent's divorce action and, therefore, not relevant to the equitable estoppel argument. While this may be true, Kentucky law clearly holds that the child's interest is paramount in a custody dispute. Should S.D. be permitted to abandon his parental obligations, his actions would undoubtedly have a profoundly detrimental effect not only upon H.D., but R.D. and B.D., as well. In those jurisdictions where equitable estoppel is applied to paternity actions, the courts have held that the object of the reasonable reliance for purposes of establishing estoppel is the affected child. See M.H.B. v. H.T.B., 498 A.2d at 778.
[18] 255 N.J.Super. 185, 604 A.2d 695 (1990).
[19] Id. at 187, 604 A.2d 695.
[20] Id. at 188, 604 A.2d 695.
[21] 97 N.J. 154, 478 A.2d 351 (1984).
[22] J.W.P., 255 N.J.Super. at 191, 604 A.2d 695.
[23] Id. (emphasis in original).
[24] Id. at 190-91, 604 A.2d 695 (emphasis added) (citation omitted).
[25] In a footnote, the dissent questions whether the application of equitable estoppel to paternity actions would be better addressed by the legislature rather than the courts. Although Kentucky does not have a particular statute addressing paternity by estoppel, the overriding statutory concern in custody actions is the best interest of the child. We believe that our decision best comports with this statutory requirement in ensuring that the best interests of H.D. are met. See Dissent, n. 37.
[26] 189 Cal.App.2d 658, 664, 11 Cal.Rptr. 707 (Cal.Dist.Ct.App.1961).
[27] Id. at 674, 11 Cal.Rptr. 707.
[28] See Kristen Santillo, Disestablishment of Paternity and the Future of Child Support Obligations, 37 Fam.L.Q. 503, 505 (2003).
[29] Kentucky Revised Statutes.
[30] Human Leukocyte Antigen, a type of blood test.
[31] Santillo, supra n. 28 at 506.
[32] Commonwealth of Kentucky ex rel. Hansard v. Schackleford, 908 S.W.2d 671, 672 (1995).
[33] Wright v. Black, 856 P.2d 477 (Alaska 1993).
[34] Last night I saw upon the stair A little man who wasn't there He wasn't there again today Oh, how I wish he'd go away ... (etc.) Hughes Mearns (1875-1965)
[35] The family court, and the majority, charge S.R.D. with having held himself out as H.D.'s father for over nine years. However, H.D. was born in 1995; and the decree of dissolution was entered in 1997. The DNA test results became available in late 2003. The test was requested less than seven years after S.R.D. first had reason to suspect he might not be H.D.'s father. The Motion to Set Aside Child Support was filed six months after S.R.D. received the results, in the midst of ongoing custody, visitation, and support litigation.
[36] See Santillo, supra n. 28 at 508.
[37] Another question that bears asking is whether this issue would be better addressed to the legislature than the courts; see, e. g., the Uniform Parentage Act, Art. 6, Part 1, § 608 (2002 Rev.), and Ga.Code Ann. § 19-7-54 (2002).