David CALFEE, Appellant

v.

COMMONWEALTH of Kentucky CAB-
INET FOR HEALTH AND FAMILIES
and Tammy Aquilina, Appellees.

No. 2006–CA–001446–ME.

Court of Appeals of Kentucky.

Aug. 3, 2007.

Brian K. Darling, Louisville, KY, for
Appellant.

Stuart W. Cobb, Frankfort, KY, for Appellee.

Before COMBS, Chief Judge; ACREE and TAYLOR, Judges.

## OPINION

COMBS, Chief Judge.

David Calfee appeals from findings of fact, conclusions of law, and an order of the Jefferson Family Court denying his request for modification of a portion of a court-ordered child support obligation that had already accrued. After our review, we reverse and remand for further proceedings.

In August 1988, Calfee and Tammy Aquilina began living together in Kentucky. On July 7, 1990, Tammy gave birth to A.M.C. The couple eventually moved to Michigan where L.K.C. was born on January 19, 1992. Calfee and Aquilina separated in April 1993, and Calfee returned to Kentucky.

In 1995, pursuant to the terms of the Uniform Reciprocal Enforcement of Support Act, Aquilina initiated a proceeding against Calfee in Michigan to enforce his duty of support. In an affidavit intended to establish paternity for L.K.C., Aquilina admitted that she had had sexual intercourse with at least one man *other than Calfee* during the 30 days prior to or 30 days following L.K.C.'s conception. Aquilina indicated that she had not told Calfee that he was L.K.C.'s father and that Calfee had never acknowledged that he had fathered the child. Finally, Aquilina stated that L.K.C. did not physically resemble Calfee, conceding that Calfee might not be L.K.C.'s biological father.

Despite the obviously tentative nature of this affidavit, Michigan officials transmitted the child support enforcement proceeding to Kentucky. Calfee was served with a civil summons on October 30, 1995. In his answer, Calfee requested a DNA test to establish L.K.C.'s paternity. The older child, A.M.C., returned to live with Calfee in Kentucky in 1996.

In July 1997, the Jefferson Family Court ordered the parties to submit to DNA testing. In December 1997, the Jefferson County Attorney, Child Support Division, advised Calfee that the paternity tests had been scheduled for January 13, 1998. However, Calfee could not pay the fee for the testing. In January 1998, the Child Support Division advised Calfee that the paternity test had been re-scheduled for February 12, 1998. Again, the testing was not done because Calfee could not afford to pay the laboratory fee.

In June 1998, a default judgment of paternity and an order of support were entered against Calfee. The record indicates that Calfee failed to make many of the scheduled child support payments.

The Commonwealth began to pursue Calfee for the delinquent child support payments. In 1999, he made another request for genetic testing to determine L.K.C.'s paternity. Calfee was not gainfully employed, however, and once again he could not pay for testing. In April 2001, Calfee made another request for genetic testing to establish L.K.C.'s paternity. In July 2003, Calfee and Aquilina agreed to submit to testing. In September 2004, it was determined conclusively that Calfee was not L.K.C.'s father.

In a memorandum filed with the family court in April 2005, the Commonwealth conceded that biological testing had ruled out any possibility that Calfee was L.K.C.'s father. Nevertheless, the Commonwealth argued that Calfee owed a duty of support to L.K.C. pursuant to the default judgment of the family court entered June 18, 1998. The Commonwealth computed Calfee's arrearages at more than $37,000.00.

On May 4, 2005, the family court entered findings of fact, conclusions of law, and an order. Citing our decision in *Crowder v. Commonwealth,* 745 S.W.2d 149 (Ky.App.1988), the court set aside the default judgment of paternity as to L.K.C. and terminated Calfee's support obligation with respect to this child. However, the court declined to re-calculate Calfee's child support obligation based on his duty to support A.M.C. alone. Instead, the court determined that Calfee was financially responsible for L.K.C. until the time that the judgment of paternity had been set aside. The court concluded that if Calfee had timely undergone genetic testing, "both the Cabinet and Ms. Aquilina could have been seeking another possible father of [L.K.C.] and obtaining child support from him for that child." Order at 7. The court found that Calfee owed Aquilina more than $27,000.00 for the support of the two children.

Calfee filed a motion to alter, amend, or vacate. The motion was denied, and the court's final order was entered in May 2006. This appeal followed.

Calfee argues that the family court erred by refusing to set aside the arrearage attributable to his support obligation to L.K.C. and by refusing to credit him with the support payments that he had made for L.K.C.'s benefit pursuant to the initial order of paternity and support. He contends that the court's order setting aside the initial order of paternity from the default judgment extinguished his obligation of support—including the alleged arrearage. He claims that in light of the circumstances of this case, it is manifestly unjust to require him to pay support for a child that he had never claimed as his own, whose mother had reservations as to his paternity, and with whom he did not establish familial bonds.

In response, the Commonwealth argues that Calfee is entitled only to prospective relief from the support obligation and that the family court did not abuse its discretion by refusing to set aside that portion of the support order that had already accrued. Citing our decision in *S.R.D. v. T.L.B.,* 174 S.W.3d 502 (Ky.App.2005), the Commonwealth contends that Calfee is equitably estopped from obtaining retroactive relief from the paternity judgment and resulting support arrearage.

We have recently applied the principles of equitable estoppel to prevent a former husband from denying paternity and the resulting duty of support. *See S.R.D. v. T.L.B.,* 174 S.W.3d 502 (Ky.App.2005). However, we are not persuaded that those principles should govern in this case.

In *S.R.D.,* a former husband was held to be equitably estopped from denying paternity and his support obligation because he did not challenge paternity for six years after learning that he may not have been the child's biological father. Even after he confirmed that he was not the biological father, he continued to cultivate and to nurture filial bonds with the child, holding himself out as her father. We concluded that he was equitably estopped from asserting that he was not the child's legal father as a result of his actions and the child's reliance on his conduct.

■ The facts of the case before us are strikingly distinguishable. A legal *presumption* that Calfee was L.K.C.'s biological father was never at issue. L.K.C. was neither conceived nor born during lawful wedlock. Moreover, the record does not suggest that Calfee took any action whatsoever to represent that he was L.K.C.'s natural father. Although Calfee's name appeared on the birth certificate (per Aquilina's request), there is nothing in the record to indicate that anyone ever regarded him as L.K.C.'s biological father. Therefore, Calfee's conduct did not establish a basis to estop him from asserting:

(1) that he is not L.K.C.'s legal father and (2) that he should never have been obligated (either on legal or equitable grounds) to provide for the child's support.

We acknowledge that Kentucky has a long-standing public policy prohibiting recoupment or restitution of excess child support payments unless benefits not utilized for actual support have accumulated. *See Clay v. Clay,* 707 S.W.2d 352 (Ky.App. 1986). However, after the family court issued its order as to Calfee, the Supreme Court of Kentucky rendered its opinion in *Denzik v. Denzik,* 197 S.W.3d 108 (Ky. 2006).

■ In *Denzik,* the court held that a husband could recover child support payments made to his former wife where the support obligation had arisen as a result of a fraudulent claim by the ex-wife that the husband was her child's biological father. Thus, since *Denzik,* if a mother is found to have committed fraud or misrepresentation, child support obligations that **have already accrued** may be subject to modification. *See Wheat v. Commonwealth of Kentucky, Cabinet for Health and Family Services,* 217 S.W.3d 266 (Ky.App.2007).

■ Although the decision in *Denzik* is somewhat distinguishable from the case now before us, we conclude that the decision supports the proposition that past child support obligations are voidable in some instances. *See Wheat, supra.* We are persuaded that the circumstances of this case constitute proper grounds for voiding Calfee's support obligation.

The *Denzik* opinion sets out the factors that must be shown to establish fraud or misrepresentation: 1) a material misrepresentation; 2) which is false; 3) that is known to be false or made recklessly; 4) that is made with inducement to be acted upon; and 5) that is acted upon, causing injury. *Denzik,* 197 S.W.3d at 110. The evidence in this case indicates that even though Aquilina had sufficient reason to

assume that Calfee was not L.K.C.'s biological father, she nevertheless pursued him for support, urging the family court to treat him as the biological father and to enter an order of support against him.

It is clear from the evidence that Aquilina had no legitimate reason to assume that Calfee was L.K.C.'s father. On the contrary, she had ample cause to believe that Calfee may *not* have fathered the child. The evidence suggests that Aquilina did not in fact believe that Calfee was the child's father.

In her affidavit, Aquilina admitted that she had engaged in sexual intercourse with at least one man other than Calfee at or near the time of L.K.C.'s conception. Aquilina admitted that she had never indicated to Calfee that he was L.K.C.'s father, nor had she represented to others that he was the child's father. There is no indication that the child ever considered or knew Calfee to be her father—particularly in light of the fact that A.M.C. visited Calfee and ultimately came to live with him in Kentucky while L.K.C. did not. Aquilina admitted that L.K.C. did not resemble Calfee; she affirmatively told others that he was *not* L.K.C.'s father. Nonetheless, she initiated legal action against Calfee for support.

While it is true that Calfee could have put an end to the issue by submitting to genetic testing, he apparently did not have the means by which to do so. Although there was no indication that he was the father of the disputed child, Aquilina, with the assistance of Michigan officials, caused Calfee to bear the cost of proving that he was not the child's father. She chose to withhold the name of the child's true biological father at the expense of Calfee and the agents of the Commonwealth who endeavored to assist her.

On remand, the family court must examine the evidence to determine whether Aquilina's actions amounted to fraud or misrepresentation. If so, Calfee is entitled to the relief he seeks, and the arrearage should be set aside.

The order of the Jefferson Family Court is reversed, and this matter is remanded for further proceedings.

ALL CONCUR.